NOTICE
Decision filed 07/23/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 160458

NO. 5-16-0458

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 14-CF-1068 |
| | ) | |
| CALEB R. BAILEY, | ) | Honorable |
| | ) | Kyle Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court, with opinion.
Presiding Justice Welch and Justice Overstreet concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Caleb R. Bailey, appeals his conviction for first degree murder in the shooting death of Travis Mayes. Evidence at trial revealed that, in the weeks leading up to the shooting, the defendant was hurt and angry because Mayes was involved with the defendant's girlfriend, Brittney Bess. The defendant asserted that he shot Mayes because he was afraid that Mayes was going to shoot or stab him. On appeal, the defendant argues that the court erred by failing to ask jurors whether they understood all four principles embodied in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). He acknowledges that counsel did not object, but he urges us to review this claim under the plain error doctrine. He also argues that he received ineffective assistance of counsel because his trial attorney failed to (1) request that jurors be instructed that a witness is not required to speak to an attorney before testifying, (2) object to evidence and

1

argument concerning his invocation of the right to remain silent, and (3) object to evidence of other bad acts or request a limiting instruction. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3      The defendant and Bess began dating when they were in high school. Their relationship had its ups and downs. The defendant joined the Army National Guard at 17 and deployed to Egypt in 2010 and 2011. Both the defendant and Bess were unfaithful to each other during the defendant's deployment. According to the defendant, however, they forgave each other and moved on.

¶ 4      The defendant became acquainted with Mayes because Mayes worked as a bouncer at the Rust Bucket, a bar the defendant frequented. Although the defendant characterized their friendship as being "bar buddies," he also testified that he spent time with Mayes away from the bar participating in activities related to their mutual interest in motorcycles. At some point, the defendant introduced Bess to Mayes and asked Mayes to help Bess get a job at the Rust Bucket.

¶ 5      Shortly after the defendant's return from his deployment in Egypt, Bess became pregnant with their daughter, Avery. At some point after Avery's birth, Bess broke up with the defendant and began an affair with Mayes. It is not entirely clear which of these events came first. A few weeks before the shooting, Bess had an argument with Mayes. She moved back in with the defendant, and the two agreed to try to rekindle their relationship and fix the problems they had. However, Bess either continued or resumed her relationship with Mayes during this period.

¶ 6      On May 17, 2014, Bess went to a bar with some of her friends. There, she met up with Mayes. The defendant and Bess exchanged text messages and phone calls while she was at the bar. According to the defendant, Bess asked him to come to the bar to talk to Mayes. The defendant encountered Mayes outside the bar. Ultimately, the two men confronted each other in the parking lot of a chiropractic office a mile down the road. Shortly thereafter, Mayes's body was found in

2

that parking lot with his motorcycle lying on top of one of his legs. The defendant acknowledged that he shot Mayes. He claimed that Mayes reached towards his waistband and said, "I've got something for you." The defendant claimed that he then shot Mayes because he feared for his life.

¶ 7 The defendant drove home after shooting Mayes. He called his father, Willie Bailey, and asked him to bring his daughter, Avery, home. Bess arrived home shortly after Willie arrived with Avery. The defendant told them that he shot Mayes and asked them to call 9-1-1.

¶ 8 The defendant was arrested at his home during the early morning hours of May 18, 2014. He gave a brief video-recorded statement in the police cruiser while it was parked in front of his house. The officer, Illinois State Police Agent Elbert Jennings, advised the defendant of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and the defendant signed a waiver form. Agent Jennings then asked the defendant, "What happened with you and Travis?" The defendant replied, "Um, I'd prefer to have a lawyer, I think." Agent Jennings responded, "Okay." Without further prompting, the defendant said, "We talked, and the conversation ended, and I came home." Agent Jennings then asked the defendant, "Did you say you want to have a lawyer?" The defendant replied, "I think when it comes to questions involving myself and Travis, that would be best." Agent Jennings did not ask any further questions. He transported the defendant to the Madison County jail.

¶ 9 That afternoon, the defendant indicated that he wanted to speak to Agent Jennings and that he was willing to give a statement without his attorney present. He gave another video-recorded interview at the jail, beginning at approximately 3:25 in the afternoon. At the outset, Agent Jennings asked the defendant to confirm that he wanted to speak to him without his attorney present and that he was the one who reinitiated contact. After the defendant did so, Agent Jennings again provided the defendant with the *Miranda* warnings and had him sign a waiver form.

3

¶ 10 Agent Jennings then asked the defendant to tell his story. The defendant began by stating that he caught Bess cheating on him with Mayes, a man he thought was his friend. He told Agent Jennings that in the weeks leading up to the shooting, he and Bess were "trying to work on [their] relationship." He then recounted the events of May 17 and 18, 2014. He stated that on May 17, both he and Bess worked until approximately 10 p.m. While they were at work, they exchanged text messages and talked on the phone. During these discussions, Bess told the defendant that she wanted to go out after work. The defendant preferred to stay home. He also wanted to "work on" trusting Bess again. For these reasons, he told Bess to go out with her friends, but he asked her to be home by 1 a.m.

¶ 11 The defendant told Agent Jennings that while Bess went out with her friends, he stayed home, caught up on some yard work, and cleaned his motorcycle. He admitted that he drank margaritas while he was doing so. He noted that although he had only three margaritas, he used almost an entire fifth of tequila to make them.

¶ 12 The defendant stated that he and Bess continued to exchange texts while she was out with her friends. Bess told him that she was at Nick's Bar with three friends, including a girl named Sammie. The defendant drove by Sammie's house and saw that her vehicle was parked in the driveway. He admitted that he photographed Sammie's vehicle. He also drove past Nick's Bar and saw that Mayes's motorcycle was parked nearby. He stated, "And I was like, okay, well they're still doing the same shit, she's just fucking with me."

¶ 13 The defendant told Agent Jennings that he drove home after seeing Mayes's motorcycle and continued to drink. He acknowledged that he "started to up the tequila in [his] margaritas." He told Agent Jennings that he and Bess continued to exchange text messages and phone calls. He sent her a message asking if she wanted to go for a motorcycle ride with him. She said, "No." The

4

defendant admitted that he replied by stating, "Well maybe if I painted my bike green and white, you'd want to ride home on my bike." He explained that those were the colors of Mayes's motorcycle. At some point, Bess sent the defendant a text message telling him that she did not really want to reconcile with him and explaining that she only moved back in with him because she was afraid of losing custody of their daughter, Avery.

¶ 14    Agent Jennings asked the defendant why he went back to Nick's Bar. The defendant explained that during the evening, he and Bess had been discussing the state of their relationship through text messages and phone calls. He stated that during this exchange, Bess asked him to come to Nick's to discuss the situation with Mayes. He also told Agent Jennings that, prior to this time, Mayes had agreed to tell the defendant if Bess contacted him.

¶ 15    The defendant continued his narrative. He told Agent Jennings that as he sat in his vehicle outside Nick's Bar, he saw Mayes leave the bar and get on his motorcycle. He stated that they both drove the same direction down Route 203, but he denied that he intentionally followed Mayes. According to the defendant, he pulled up next to Mayes, and Mayes waved for him to pull over. The defendant stated that he and Mayes both pulled into the parking lot of a chiropractic office, where they discussed the situation. According to the defendant, Mayes told him to leave Bess alone, telling him, "That's my girl, that's not your girl."

¶ 16    It was at this point, approximately 18 minutes into the interview, that the defendant first mentioned that when he pulled over, he took his pistol out of the glove box and placed it on his lap. He explained, "I'm kind of scared of the guy. He's got a big rap sheet." The defendant continued his story, telling Agent Jennings that after Mayes told him to leave Bess alone, he asked Mayes, "Well, what are we gonna do?" At this point, according to the defendant, Mayes stood up, started reaching towards his waistband, and said, "I've got something for you, motherfucker." The

5

defendant stated that he was scared by this and "freaked out." He picked up his pistol, fired one shot, and saw Mayes fall. He admitted that he "freaked out" and drove off.

¶ 17    The defendant stated that he tried to call Bess, but she did not answer her phone. He then called his father, who was babysitting Avery, and asked him to bring her home. He explained that he intended to turn himself in and he wanted to hug his daughter before he went to jail. The defendant told Agent Jennings that his father arrived at the house with Avery just before Bess arrived home. He stated that when Bess arrived, she began yelling at the defendant's father, angry that he had woken Avery up in the middle of the night. The defendant told Bess that he shot Mayes and thought he was dead.

¶ 18    In response to questioning, the defendant stated that Mayes was standing approximately six to eight feet away from him while they were talking in the parking lot. He also stated that Mayes turned off the engine of his motorcycle so they could hear each other. Although Mayes stood up, he did not get off his motorcycle. The defendant noted that he remained inside his vehicle, with his seatbelt on. Although his vehicle was in park, he left the engine running.

¶ 19    The defendant then volunteered that he knew he should not have had the pistol with him that night, but he explained that he brought it with him because he was afraid of Mayes. He explained that this fear was also the reason that he never went into the bar that night. He then said, "Obviously, it's not a concealable weapon. It's a large .357." Agent Jennings asked the defendant whether he had a concealed carry permit, to which the defendant replied, "No."

¶ 20    At trial, the defendant argued that the defendant acted in self-defense when he shot Mayes. As an alternative, he argued that he should be convicted of second degree murder, rather than first degree murder, because he had an actual, but unreasonable, belief that he needed to act in self-

6

defense. The State's theory of the case was that the defendant acted out of his anger over Mayes's relationship with Bess.

¶ 21 The State's first witness was Agent Jennings. He provided the foundation for the admission of both of his video-recorded interviews with the defendant, which were then played for the jury. In addition, Agent Jennings testified that Mayes and his motorcycle were found in the parking lot of Forbes Chiropractic, which is approximately one mile from Nick's Bar.

¶ 22 Trooper Derek Cullen and Detective Tim Lawrence both responded to the defendant's home in response to the 9-1-1 calls placed by Bess and Willie. Both testified that the defendant was cooperative during his arrest. Trooper Cullen testified that an unloaded pistol was on the living room floor, surrounded by one spent shell casing and five unspent bullets.

¶ 23 Trooper Grant Hentze is the crime scene investigator who processed the scene where Mayes's body was found with his motorcycle. He testified that although he did not find any weapon in either of Mayes's hands, he did find a pocketknife on his person. Trooper Hentze did not recall where the knife was found. He testified that the knife had a 3- to 3½-inch blade. Asked on cross-examination whether the knife could be used to inflict a fatal would, he indicated that it most likely could.

¶ 24 The State presented the testimony of three of the defendant's friends—Kurt Watters, Jesse Bush, and Michael Heath. Watters had known the defendant for 10 years and considered him a close friend. He testified that he went to Nick's Bar that night with Bush and Heath. When they arrived, Watters saw Bess there with some female friends. Mayes arrived approximately 15 minutes after Watters and his friends. According to Watters, when he saw Bess and Mayes together, they appeared to be "handsy" and "flirtatious."

7

¶ 25 Watters testified that at some time between 1 a.m. and 2 a.m., he and Bush went to retrieve Watters' cell phone, which he had left in his vehicle. The vehicle was parked across the street in the parking lot of a bank. As they crossed the street, Watters saw the defendant's vehicle. The defendant waved for Watters and Bush to come over to his vehicle, which they did. Watters testified that the defendant usually "has this very friendly, loving, outgoing personality," but he did not "seem like his normal self" when they saw him that night. According to Watters, the defendant offered him $500 to go into the bar and "kick Travis's ass." Watters declined, and the defendant drove away. Watters and Bush then retrieved Watters's cell phone, returned to the bar, and told Heath that they saw the defendant outside and he "didn't seem right."

¶ 26 Watters further testified that Bess asked him for a ride home, and he agreed to drive her. Watters left with Bess, Bush, and Heath. Watters estimated that they arrived at the home shared by the defendant and Bess at approximately 3:30 or 3:35 a.m. The defendant and his father were in the front yard when they arrived. Bess exited the car, and she and the defendant began yelling at each other. Watters then drove away.

¶ 27 Bush testified that he heard the defendant offer Watters $500 to fight Mayes. He also confirmed Watters's testimony concerning the argument that ensued when they dropped Bess off at the home she shared with the defendant. On cross-examination, he acknowledged that when he spoke to police, he did not mention the argument between the defendant and Bess.

¶ 28 Heath testified that at the time the events at issue unfolded, he was aware that Bess was dating both Mayes and the defendant. He noted that although the defendant had never said that he wanted to harm Mayes, he knew the defendant was upset about the situation. Heath testified that he saw Bess and Mayes together at Nick's Bar on the night in question. Although he did not see the defendant that night, he was made aware that the defendant was outside the bar. He called the

situation to the attention of the bar manager. Asked why, he stated that he was concerned because of the circumstances involving the defendant, Bess, and Mayes. Finally, Heath testified that the defendant did not ordinarily carry a gun with him unless he was hunting or going to the shooting range.

¶ 29   Alexander Arosemena, the manager of Nick's Bar, and Ashley Barnes, the bartender working that night, both testified for the State. Arosemena was friends with Mayes, and he knew the defendant and Bess casually. He testified that he never heard Mayes make any threats against the defendant. Both Arosemena and Barnes testified that they saw Bess arrive with some female friends on the night of the shooting. Both also testified that they later saw her with Mayes.

¶ 30   The defendant's father, Willie, testified that on the night of the shooting, he and his wife were babysitting Avery at their home. The defendant called them and asked them to bring Avery home to his house. Willie drove Avery to the defendant's home. Shortly after he arrived, Bess arrived home. Willie testified that the defendant said to her, "I shot your effing boyfriend." He noted that he did not want to use the actual word used by his son because he did not curse. Willie further testified that when he spoke to the defendant later that morning, the defendant said that Mayes told him that Avery would start calling Mayes "Daddy" and that he then "blew his brains out." During this conversation, the defendant did not mention seeing Mayes reach into his waistband or thinking that he might have a weapon.

¶ 31   On cross-examination, Willie was asked if he had any reason to believe that the defendant was afraid of Mayes. He replied, "Not Travis Mayes himself, but he was afraid of, someone had threatened him. I don't know who."

¶ 32   The State next introduced into evidence text messages retrieved from the defendant's cell phone and Facebook posts and messages. The text messages were introduced through the

9

testimony of Special Agent James Peterson, who performed a cell phone extraction on the defendant's phone, and through printouts in People's Exhibit 49. The text messages were voluminous. Although we need not discuss all of them in detail, we observe that the State relied heavily on these messages to support its theory that the defendant was angry at Mayes and jealous of his relationship with Bess in the weeks leading up to the events of May 17 and 18, 2014. As such, we will highlight some of these messages.

¶ 33    On March 29, 2014, the defendant sent Mayes a text saying, "What sucks is I still love her and she is just another piece of ass to you." On April 5, Mayes sent the defendant a text telling him that he was in love with Bess, but he could not understand why she liked him or why she would leave the defendant. Later that day, the defendant responded, "Dude, what you've done is wrong. Shaking my hand the whole time, me trusting you and asking you to make sure she was okay every time I came to that bar." Still later, the defendant sent Mayes a text telling him that although he blamed Bess more than Mayes, he felt hurt by Mayes because he considered him to be a friend.

¶ 34    People's Exhibit 49 includes multiple text exchanges between the defendant and Bess in which the defendant expressed anger over Bess's relationship with Mayes. The exhibit also includes a series of text messages between the defendant and Bess in which the defendant told Bess that he wanted to get back together with her.

¶ 35    The State also presented evidence that the defendant sent Mayes a text on his birthday. In it, the defendant wrote, "I'd wish you a happy birthday, but I don't have to because my girlfriend's doing it for me." Attached were two sexually explicit photographs of the defendant with Bess.

¶ 36    People's Exhibit 49 includes a series of text messages from early in May 2014 in which Bess told the defendant that she had an argument with Mayes. In the exchange, Bess and the defendant agreed to attempt a reconciliation.

10

¶ 37    Finally, People's Exhibit 49 includes the messages exchanged between the defendant and Bess on the night of the shooting. Shortly before 2 a.m., the defendant sent Bess a text message asking if she wanted to go for a bike ride. Bess responded, "I [am] talking to Sammie. No. You're drunk." A few minutes later, Bess sent the defendant a text saying that her friend, Kristin, would bring her home soon. The defendant replied, "Kristin already left." He then sent a text stating, "Maybe you wanna ride that green and white soft tail home." A few minutes later, the defendant sent Bess another text saying, "The first time you go out since we're working on things and it's right back where we left off. Won't come home."

¶ 38    Special Agent Peterson testified that in performing the cell phone extraction, he was also able to retrieve information about Internet searches the defendant conducted from his phone. He further testified that between 1:34 a.m. and 1:35 a.m. on May 18, 2014, the defendant conducted two searches for Mayes, one search for Bess, and one search for Nick's Bar. The defendant acknowledged in his second statement to Agent Jennings that he looked up Mayes, Bess, and Nick's Bar on Facebook that night.

¶ 39    Agent Jennings was recalled to the stand to testify about Facebook posts and messages recovered related to this case. He testified that on March 29, 2014, the defendant posted a photograph of Bess and Mayes together on his Facebook page. In the post, the defendant wrote, "This isn't rumor. I caught them together after my suspicions got the better of me." Agent Jennings further testified that he found no messages of any kind sent from Mayes to the defendant on Facebook, and he found no messages or posts in which the defendant stated that he had been threatened by Mayes.

¶ 40    Bess testified for the defense. Asked about Mayes's reputation in the community, she testified that he is known to be violent. She was then asked if she witnessed any threats of violence

11

by Mayes. Bess testified that Mayes once made a phone call to the defendant in her presence in which he told the defendant to leave Bess alone or he would kill the defendant and Avery would then call Mayes "Dad." She described another incident that took place at the Rust Bucket while she was working. She testified that the defendant planned to meet her there to discuss their daughter. He asked her to ask Mayes to leave. She alleged that when she did so, Mayes told her to tell the defendant that he had left but that he was instead going to wait in the office with a baseball bat. Bess testified that she told the defendant not to come to the Rust Bucket that night.

¶ 41    Finally, Bess testified that Mayes owned three weapons—a pistol, a switchblade, and a baton. She testified that he kept the knife in his pocket, and he kept the pistol in the waistband of his pants. She further testified that she never knew him not to carry at least one of the weapons.

¶ 42    On cross-examination, Bess acknowledged that when she spoke to police immediately after the murder, she did not tell them any of the things she testified to during direct examination. She further acknowledged that she did not tell anyone from the police or the prosecutor's office that Mayes carried a gun. Bess acknowledged making the following four statements to Agent Jennings: (1) the defendant deliberately angered Mayes by telling him that he had raped Bess, (2) the defendant hated Mayes for becoming involved with Bess, (3) she was tired of the defendant issuing threats to her every day concerning custody of their daughter, and (4) she loved Mayes.

¶ 43    The defense introduced into evidence a certified copy of Mayes's 1999 conviction for retaliating against a witness. Mayes's sister, Amber Duke, later acknowledged that Mayes went to prison more than once.

¶ 44    The defendant testified on his own behalf. Much of his testimony was consistent with his second statement to Agent Jennings, although he offered some additional details. He testified that he began dating Bess in high school and enlisted in the Army National Guard at the age of 17.

12

After he returned from a deployment to Egypt in 2011, Bess became pregnant with Avery, and his father's health began to decline. He testified that he applied for Inactive Relief Reserve (IRR) status with the Army National Guard because this would allow him more time to care for his child and his father.

¶ 45 The defendant next testified about his friendship with Mayes. He testified that he met Mayes at the Rust Bucket, and they became "bar buddies," but they were not "best friends." The defendant testified that Mayes once offered to trade him a motorcycle in exchange for a pistol. The defendant refused to make the trade because Mayes was a convicted felon. According to the defendant, Mayes responded by calling him a "pussy" and telling him that he already owned guns. He testified that Mayes also showed him the knives and guns that he owned.

¶ 46 Defense counsel asked the defendant whether he had received any specific threats from Mayes. He testified that Mayes threatened him after a heated argument between Bess and her mother, which left Bess upset and crying. The argument took place in the presence of the defendant. Later, according to the defendant, Mayes called him and told him that he was to blame for allowing Bess to get "her ass kicked by her mom." The defendant stated that Mayes then threatened to kill him over the incident and told him that within a year Avery would be calling Mayes "Daddy."

¶ 47 The defendant next testified about the events that took place on the night he shot Mayes. Much of his testimony was similar to what he told Agent Jennings. He testified that at some point while Bess was at Nick's Bar, she sent him a text message asking him to come to the bar to talk to her and Mayes. He drove to the bar but decided not to go in because he was afraid that he would be beaten up if he encountered Mayes and his friends in the bar. Instead, he explained, he decided to wait outside for Bess.

13

¶ 48   The defendant testified that while waiting for Bess, he talked to Watters. He stated that he asked Watters to go into the bar and get Mayes to leave. When Watters asked how he was supposed to do that, the defendant replied, "I don't know. I don't need you to get into a fight with the guy." The defendant testified that he then decided to leave because he realized that staying to talk to Mayes and Bess "was probably a terrible idea." As he was preparing to leave, he saw Mayes leave the bar and get on his motorcycle to go home. As he did in his statement to Agent Jennings, the defendant stated that he drove the same direction as Mayes, but he denied following him.

¶ 49   The defendant testified that when he and Mayes stopped next to each other for a traffic light, Mayes waved for him to pull over, and he followed him into the parking lot of Forbes Chiropractic. His description of the confrontation that follows was mostly consistent with what he told Agent Jennings previously; however, he added details about the conversation that preceded the shooting. The defendant testified that Mayes told him to stop "messing with" Bess's head. He stated that the conversation then "started to escalate" to include raised voices and "a lot more cussing." He testified that Mayes then reached with his hand towards the front of his waistband and told the defendant that he "had something" for him. The defendant testified that at this point, he picked up his pistol and fired one shot. He explained that he feared for his life because he knew that Mayes was a violent person who usually carried a weapon.

¶ 50   On cross-examination, the defendant acknowledged that he told police that he intentionally failed physical training requirements in order to get IRR status. He explained that this lowered his "promotion points" so that he would be eligible for IRR. He further acknowledged that he did not have any problems with Mayes until March 2014. The prosecutor asked the defendant about his claim that Mayes threatened to kill him for allowing a fight between Bess and her mother. The

14

defendant testified that he took the threat seriously, but he admitted that he did not report it to the police.

¶ 51   The defendant acknowledged that he discovered Bess was not with her friend Sammie because he drove by Sammie's house and photographed her vehicle in the driveway. He further admitted to checking the Facebook pages of Bess, Mayes, and Nick's Bar to see if any pictures of Bess and Mayes had been posted. He acknowledged that he was upset to learn that Bess was with Mayes that night.

¶ 52   When asked why he pulled into a parking lot with Mayes if he was afraid of him, the defendant replied, "Poor judgment." He acknowledged that he did not see anything in Mayes's hand before he shot him. He further acknowledged that, after the shooting, he left without checking to see if Mayes had a survivable injury. He also acknowledged that he did not immediately call the police or an ambulance when he arrived home.

¶ 53   The defendant was then questioned about the statements he made to his father, Bess, and Agent Jennings shortly after the shooting. He acknowledged that he never told either his father or Bess that he saw Mayes reach for something in his waistband. The following exchange then occurred:

"Q. [ASSISTANT STATE'S ATTORNEY] In your first interview with Elbert Jennings ***, you never said a single word about Travis Mayes reaching into his pants?

A. I didn't discuss the incident.

Q. Well, you told Elbert, 'We talked, the conversation ended, and I went home'?

A. Yes. I asked for an attorney.

Q. You said, 'we talked'?

A. Yes.

15

Q. 'The conversation ended, and I went home'?

A. Yes.

Q. At no point during that statement is there anything about Travis reaching into his pants?

A. No."

The defendant then acknowledged that during his second interview with Agent Jennings, he did not mention his fear of Mayes until approximately 20 minutes into the interview.

¶ 54 On redirect examination, the defendant testified that he was on suicide watch during the period between the two interviews. He further testified that he was under stress and that he did not have the luxury of organizing his thoughts before speaking to Agent Jennings.

¶ 55 The State called Mayes's sister, Duke, as a rebuttal witness. She testified that after Mayes's death, she cleaned out his home and she did not find any guns.

¶ 56 Because one of the defendant's claims of ineffective assistance of counsel focuses on remarks made during the State's closing argument, we will discuss that argument in detail. The prosecutor began his argument, stating, " 'I shot your fucking boyfriend; Travis said Avery was going to start calling him Daddy; we talked, the conversation ended, and I went home.' These are the things that the defendant said minutes and hours after he shot Travis Mayes in the head." The prosecutor then argued that the evidence showed that the defendant was a jealous "scorned lover" who was angry because he could not be with Bess, the woman he loved.

¶ 57 The prosecutor went on to explain the defense of self-defense to the jury. He explained that the use of force is justified "when and to the extent that [the defendant] reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force." He then discussed whether the defendant's conduct on the night of the murder was reasonable. He

16

highlighted evidence that the defendant drove to Bess's friend Sammie's house to see if she was home because he did not believe Bess when she told him she was with Sammie. He also highlighted evidence that the defendant drank a fifth of tequila, then grabbed a loaded gun, and put it in his car. He asked jurors, "Is that reasonable after drinking a fifth of a bottle of tequila? Let me grab a gun. Let me put it in my car. He didn't even have a concealed carry permit." The prosecutor then highlighted evidence that the defendant drove to Nick's Bar, waited outside, offered a friend $500 to beat up Mayes, and followed Mayes down Route 203 for a mile. He also highlighted the defendant's acknowledgement that, after the shooting, he drove away without checking to see if Mayes was alive or calling an ambulance.

¶ 58    The prosecutor next addressed the question of whether the defendant's use of force was necessary. He noted that although there was a knife in Mayes's pocket, there was no weapon in his hand. He emphasized that Mayes was six to eight feet away from the defendant and the fact that the defendant was seated in his vehicle.

¶ 59    The prosecutor then went on to address the credibility of the defendant's claim that he feared for his life when he shot Mayes. He argued, "Remember, the first hour he talked to Elbert [Jennings], you saw that just a couple [of] hours after it happened, what did he say? 'We talked, the conversation ended, I went home.' " He went on to argue, "It was only during the second interview, 20 minutes into it, the first time we hear, 'Well, I was kinda scared.' That's actually what he said the first time." The prosecutor continued this line of argument, stating that if someone were truly afraid for his life, he would "shout it from the rooftop." He continued, "Wouldn't it be the first thing you [would] say to everyone you meet? Wouldn't it be, 'I had to do it?' Or would it be, 'I just shot your fucking boyfriend'? Or would it be, 'Well, Travis said Avery was going to call

17

him Daddy, so I blew his brains out'? It's what he said to his own father. Would it be, 'We talked, the conversation ended, and I went home'?"

¶ 60    The prosecutor went on to argue that the defendant was manipulative. As evidence for this inference, he pointed to the fact that the defendant admitted to intentionally failing physical training requirements in order to qualify for IRR status.

¶ 61    He then returned to the theme of the defendant's initial statements to his father, Bess, and Agent Jennings. He reminded the jury what the defendant said in these statements, and he emphasized that he did not tell the police that he was scared until he had 12 hours to think about it.

¶ 62    The prosecutor then argued at length about the lack of any evidence that the defendant had expressed any fear of Mayes prior to the night in question and the evidence that he took actions inconsistent with being afraid of Mayes. He highlighted evidence that the defendant sent Mayes two pictures of the defendant with Bess, along with a message stating, "I'd wish you a happy birthday, but I don't have to because my girlfriend's doing it for me." The prosecutor argued that this was likely to antagonize Mayes. He also highlighted evidence that the defendant went to Nick's Bar to seek out Mayes.

¶ 63    The prosecutor once again returned to the defendant's statements to his father, Bess, and Agent Jennings. He argued, "And I'll ask you one more time, at any point in any of those statements did we hear a word about self-defense?" The prosecutor went on to discuss the defendant's theory of second degree murder and explain to the jury the verdict forms it would receive. He concluded by asking the jury to find the defendant guilty of first degree murder.

¶ 64    Defense counsel argued that the antagonistic text messages highlighted by the prosecution did not contradict the defendant's assertion that he was afraid of Mayes. He argued that it is easy

18

to "talk smack at a distance, but it's not the same thing as in your face and up front or six feet from your car." He argued that Mayes's conviction for retaliating against a witness showed that he was a dangerous man, and he emphasized that Mayes was armed with a knife at the time he was shot.

¶ 65    Significantly for purposes of this appeal, defense counsel went on to address the State's argument that the defendant had 12 hours in which to come up with a story between the time of the shooting and his second interview with Agent Jennings. Counsel argued, "he was in jail on a suicide watch. It's not like he was plotting what he was going to say." He also emphasized the fact that the defendant decided to speak with Agent Jennings voluntarily.

¶ 66    Counsel also addressed the State's arguments concerning the reasonableness of the defendant's conduct. He argued that the question was not whether it was reasonable for the defendant "to send dumb texts" or to make other bad decisions "that [were] unrelated to that moment." Rather, he argued, the only question was what was reasonable when Mayes "was reaching in his pants, his waistband, and said 'I got something for you, motherfucker'?"

¶ 67    The jury was instructed on self-defense and second degree murder. During deliberations, the jury foreman sent a note to the court asking the court to remind the jurors that they may not consider anything other than the evidence presented during the trial. The parties agreed that the court should tell the jurors that they had received all the instructions they needed to decide the case. The jury continued to deliberate, returning a verdict of guilty of first degree murder.

¶ 68    The court subsequently sentenced the defendant to 30 years in prison along with a mandatory 25-year sentence enhancement for using a firearm. The defendant filed a motion to reconsider that sentence, which the court denied. This appeal followed. We will discuss additional factual matters as necessary during our analysis.

¶ 69                          II. ANALYSIS

¶ 70                   A. Rule 431(b) and Plain Error Review

¶ 71    The defendant's first contention centers on the court's questioning of prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). That rule requires courts to question jurors about their understanding and acceptance of four basic principles of law known as the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)). Those principles are that (1) the defendant is presumed innocent, a presumption that stays with him throughout the proceedings; (2) the State is required to prove the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to prove his innocence; and (4) the defendant is not required to testify and, if he chooses not to do so, jurors may not draw any negative inferences from this fact. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010) (citing Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); see also *Zehr*, 103 Ill. 2d at 477. The court is required to give all prospective jurors an opportunity to indicate whether they both accept and understand each of these four principles. *Thompson*, 238 Ill. 2d at 607.

¶ 72    In this case, the court asked all prospective jurors whether they disagreed with each principle and whether they were willing to apply each principle as instructed, but the court did not ask whether they understood the *Zehr* principles. Thus, there is no dispute that the court did not fully comply with Rule 431(b). See *People v. Wilmington*, 2013 IL 112938, ¶ 32. There is also no dispute, however, that the defendant forfeited review of this claim by failing to object during *voir dire*. See *People v. Belknap*, 2014 IL 117094, ¶ 47. Thus, the question for us is whether plain error review of his claim would be appropriate.

¶ 73    The plain error doctrine allows a court of review to excuse a defendant's forfeiture under two circumstances. We may review a claim that has been forfeited if the evidence was so closely

20

balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. We may also review a claim of an error so fundamental that it undermined the fairness of the defendant's trial and threatened the integrity of the judicial process, regardless of the strength of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The defendant argues that plain error review is appropriate under both prongs of the plain error rule. We disagree.

¶ 74    We first address the defendant's contention that the evidence in the case before us was closely balanced. Under the first prong of the plain error test, the question is whether the evidence was so closely balanced that "the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. The defendant has the burden of persuading this court that the evidence was close enough to meet this standard. *People v. Choate*, 2018 IL App (5th) 150087, ¶ 52.

¶ 75    In support of his assertion that the evidence in this case was close enough to meet this standard, the defendant argues that "substantial evidence" supported his claim that he believed he needed to act in self-defense. He points to Bess's testimony that Mayes owned three weapons, and that as far as she knew, he always carried one of those weapons with him. He emphasizes evidence that a knife was found on Mayes's person after his death. The defendant also points to the report and evidence deposition of Dr. Raj Nanduri, the forensic pathologist who performed an autopsy on Mayes. According to the autopsy report, Mayes's blood alcohol content of 0.171 at the time of his death. Dr. Nanduri testified that this level of intoxication could lead to anger and emotional swings. Finally, the defendant highlights the evidence that Mayes was found lying on the ground with the motorcycle on top of one of his legs, which is consistent with his testimony that Mayes was straddling the motorcycle when he shot him. We are not persuaded.

21

¶ 76    We note that the jury was not required to find Bess's testimony credible. Her claim that Mayes owned a pistol was contradicted by the testimony of Mayes's sister, who stated that she did not find a gun when going through Mayes's possessions after his death. In addition, the jury was aware that Bess previously made statements that were inconsistent with her trial testimony.

¶ 77    Moreover, although the evidence highlighted by the defendant does provide some support for his version of events, the record contains far more evidence that supports the State's theory that the defendant shot Mayes in anger. The record contains substantial evidence that the defendant was angry at Mayes in the weeks leading up to the encounter, much of which is not contradicted. This evidence includes the numerous text messages admitted into evidence, the testimony of two of the defendant's friends that the defendant offered Watters money to beat up Mayes, and the defendant's own statement to police. There is also evidence that the defendant acted in ways that were inconsistent with his claim that he was afraid of Mayes. For example, he asked Mayes to help Bess get a job working with him at the Rust Bucket, and he sent Mayes a text with explicit photographs of Bess and the defendant shortly before the events at issue unfolded, something likely to antagonize Mayes. The fact that the defendant pulled into a deserted parking lot late at night when waved over by Mayes likewise belies his claim that he feared Mayes.

¶ 78    In addition, although Dr. Nanduri's deposition provides support for the defendant's claim that he shot Mayes while he was straddling his motorcycle, it also contradicts the defendant's claim that Mayes stood up before the defendant shot him. Dr. Nanduri explained that the bullet entered Mayes's ear and traveled on a downward trajectory. This trajectory indicated that Mayes was likely sitting on the motorcycle when he was shot, not standing, as the defendant asserted. In light of the voluminous evidence in support of the State's theory of the case, we do not find the evidence to

22

be so closely balanced that the error alone threatened to tip the scales of justice against the defendant.

¶ 79    We next consider the defendant's contention that we may review his claim under the second prong of the plain error doctrine. Under the second prong, we may review errors so serious they amount to structural errors. *Thompson*, 238 Ill. 2d at 613-14. Only "a very limited class" of errors are considered structural errors. *Id.* at 609.

¶ 80    As the defendant correctly acknowledges, both the Illinois Supreme Court and this court have repeatedly held that Rule 431(b) errors are not generally cognizable under this prong. *Sebby*, 2017 IL 119445, ¶ 52; *Wilmington*, 2013 IL 112938, ¶ 33; *Choate*, 2018 IL App (5th) 150087, ¶ 39. Our supreme court has explained that although the requirements of Rule 431(b) are designed to ensure that a defendant is tried before a fair and impartial jury (*Thompson*, 238 Ill. 2d at 609), a trial court's failure to fully comply with those requirements "does not automatically result in a biased jury" (*id.* at 610). As such, an error in Rule 431(b) questioning does not necessarily "render a trial fundamentally unfair." *Id.* at 611.

¶ 81    The defendant, however, points to language in both *Sebby* and *Thompson* suggesting that a Rule 431(b) error would be cognizable under the second prong of the plain error test if a defendant can show that the error actually resulted in a biased jury. See *Sebby*, 2017 IL 119445, ¶ 52 (explaining that such an error "is not cognizable under the second prong of the plain error doctrine, *absent evidence that the violation produced a biased jury*" (emphasis added)); *Thompson*, 238 Ill. 2d at 614 (noting that evidence "that [a] defendant was tried by a biased jury would certainly satisfy the second prong of plain-error review"). He argues that such evidence is present in this case. In support of this claim, the defendant points to the jury foreman's note to the court. The note stated, "Can you please reiterate that we should only consider the evidence presented in

23

the case!!" According to the defendant, this note demonstrates that "at least one juror was considering evidence outside of the record." We are not persuaded.

¶ 82　The defendant correctly observes that a trial before a jury that is not fair and impartial is a structural error which is cognizable under the second prong of the plain error doctrine. *Thompson*, 238 Ill. 2d at 610. He is also correct in implicitly arguing that it is improper for jurors to consider extraneous information or influences in reaching their verdict. See *People v. Hobley*, 182 Ill. 2d 404, 464 (1998). Consideration of extraneous information by jurors can serve as an independent basis for reversal. See *People v. Holmes*, 69 Ill. 2d 507, 516-19 (1978). However, reversal is not always required. *Id.* at 519. Rather, a verdict will be overturned only if, considering the nature of the extraneous information or influence, the jurors' consideration of it "involved 'such a probability that prejudice [would] result that it is [to be] deemed inherently lacking in due process.' " (Internal quotation marks omitted.) *Id.* at 514 (quoting *Estes v. Texas*, 381 U.S. 532, 542-43 (1965)).

¶ 83　Here, the foreman's note to the court does not indicate what type of extraneous information other jurors may have wanted to consider. Thus, standing alone, it would not provide a basis for reversal. The defendant, however, attempts to link his assertion of juror misconduct to the court's failure to ask jurors whether they understood all four of the *Zehr* principles. This argument has one critical flaw. The principle that jurors must decide the case based only on the evidence before them is important, but it is not one of the four *Zehr* principles, and Rule 431(b) does not address it. As such, there is no causal connection between the error and the fact that at least one juror wanted to consider extraneous information. We therefore reject the defendant's assertion that structural error occurred. Because the defendant cannot satisfy either prong of the plain error test, we do not find it appropriate to review his claim of error under Rule 431(b).

¶ 84                                    B. Ineffective Assistance of Counsel

¶ 85     The defendant argues that counsel was ineffective for (1) failing to request that the jury be instructed that a witness is not required to speak with an attorney or an attorney's investigator before testifying, (2) failing to object to what he characterizes as commentary by the prosecution on his invocation of his *Miranda* rights, and (3) failing to object to evidence of other bad acts. We reject all three claims.

¶ 86     We evaluate claims of ineffective assistance of counsel using the two-part test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail, a defendant must show both that counsel's performance was deficient and that he suffered prejudice as a result. *Strickland*, 466 U.S. at 687. To demonstrate deficient performance, a defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 687-88. This showing requires him to overcome a strong presumption that counsel's decisions constituted sound trial strategy. *Id.* at 689. To demonstrate prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 87     We will first consider the defendant's claim that counsel was ineffective for failing to ask the court to instruct the jury that a witness is not required to speak to an attorney or an attorney's investigator before testifying. This principle is included in a bracketed sentence in Illinois Pattern Jury Instructions, Criminal, No. 3.10 (4th ed. 2000) (hereinafter IPI Criminal 4th). The instruction provides: "It is proper for an [(attorney) (attorney's investigator)] to interview or attempt to interview a witness for the purpose of learning the testimony the witness will give." IPI Criminal

25

4th No. 3.10. This instruction should be given if the jury has heard evidence that any of the witnesses were interviewed or asked to be interviewed by an attorney or an investigator working for an attorney. IPI Criminal 4th No. 3.10, Committee Note. Under some circumstances, an additional bracketed sentence should be added, which provides: "[However, the law does not require a witness to speak to [(an attorney) (an attorney's investigator)] before testifying.]" IPI Criminal 4th No. 3.10. This sentence should only be included in the instruction if the jury heard evidence that a witness refused to speak with an attorney or investigator. IPI Criminal 4th No. 3.10, Committee Note.

¶ 88    Here, the jury heard testimony that Bess was interviewed by attorneys for both parties. Accordingly, the court gave the first sentence of IPI Criminal 4th No. 3.10. The jury also heard testimony that, when she was interviewed by prosecutors, Bess did not tell them that Mayes was violent or that he usually carried a weapon. The defendant argues that the bracketed second sentence of IPI Criminal 4th No. 3.10 should have been given to counteract the impact this testimony had on Bess's credibility. He contends that her testimony was crucial to his defense because she corroborated his version of events. We are not convinced.

¶ 89    We reach this conclusion because we do not believe the evidence in this case warranted inclusion of the bracketed sentence. The testimony at issue came during the State's cross-examination of Bess. Earlier, we set forth that testimony in detail. The testimony did not show that Bess refused to speak with the prosecutors or their investigators; rather, it showed that she did speak with them and that she told a story that was inconsistent with her trial testimony. Thus, the bracketed sentence was not appropriate, and the court would have properly refused to give it had counsel requested it. Counsel cannot be found to be ineffective for failing to perform an act that would have been futile. *People v. Wallace*, 2015 IL App (3d) 130489, ¶ 41.

26

¶ 90    We next consider the defendant's claim that counsel was ineffective for failing to object to what he characterizes as the State's commentary on his invocation of his right to remain silent. This claim focuses on the defendant's brief first statement to Agent Jennings. As we discussed previously, the defendant invoked his right to counsel; he then told Agent Jennings that he spoke to Mayes, the conversation ended, and he went home; and he then invoked his right to counsel again. Agent Jennings did not question him further until several hours later, when the defendant initiated further discussion. As we also discussed earlier, the State argued in closing that if the defendant were really afraid for his life when he shot Mayes, as he claimed, he would have told that to his father, Bess, and Agent Jennings when he made statements to them shortly after the shooting. The defendant contends that counsel was ineffective for failing to object to these arguments because he had a constitutional right not to say anything more to Agent Jennings. We reject this contention.

¶ 91    In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the United States Supreme Court held that it is constitutionally impermissible for the State to impeach a defendant's exculpatory testimony with his silence following his arrest and receipt of *Miranda* warnings. As such, if a defendant has remained silent, prosecutors may not cross-examine him about his failure to tell police the version of events in his testimony. See *id.* at 611. The Court reached this conclusion because it found that such a practice would be "fundamentally unfair" because a defendant has a constitutionally protected right to remain silent. *Id.* at 618. In *Anderson v. Charles*, 447 U.S. 404, 408 (1980) (*per curiam*), the Court held that "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements." The Court explained that, because a defendant who makes a statement "has not remained silent," at least "[a]s to the subject matter of his statements," such questioning does not unfairly use his postarrest silence against him. *Id.*

27

¶ 92    The question before us, then, is whether this case is controlled by *Doyle* or *Anderson*. In support of his claim that *Doyle* controls, the defendant relies heavily on the Second District's decision in *People v. Gagliani*, 210 Ill. App. 3d 617 (1991). That case involved charges of home invasion, residential burglary, armed robbery, and sexual assault. *Id.* at 619. Initially, the defendant told police that he did not know anything about these crimes and that he did not know how his fingerprints came to be found in the victim's home. *Id.* at 623-24. At trial, however, he testified that he was acquainted with the victim, and he admitted to having consensual sex with her in her home on three prior occasions. *Id.* at 623. On cross-examination, the defendant was confronted with his statement to police denying any knowledge of the crimes. *Id.* at 623-24. He was asked several times to acknowledge that he had the opportunity to tell the investigating officers his version of the events at issue. See *id.* at 625.

¶ 93    On appeal, the defendant argued that this questioning violated *Doyle*. *Id.* at 624. The appellate court agreed, explaining that the prosecution's questions "suggested that [the] defendant's trial testimony was fabricated due to the fact that he could have told the police officers the same story during the investigation but did not," a suggestion the court found to be improper due to a defendant's constitutional right to remain silent. *Id.* at 626.

¶ 94    Subsequent to the Second District's 1991 decision in *Gagliani*, several Illinois courts distinguished *Gagliani* on the grounds that the defendant did not give "authorities any version of events which later proved inconsistent; the defendant simply denied knowledge of the incident." *People v. Frieberg*, 147 Ill. 2d 326, 356 (1992); see also *People v. Maggio*, 2017 IL App (4th) 150287, ¶ 26; *People v. Huddleston*, 243 Ill. App. 3d 1012, 1025-26 (1993). Although neither party fully addresses this distinction, we note that the defendant's first statement to Agent Jennings is similar to the statement at issue in *Gagliani* in the sense that the defendant did not really give

28

Agent Jennings a substantive account of the events at issue in that statement. Nevertheless, we do not find *Gagliani*—or *Doyle*—to be controlling for three reasons. First, we find *Gagliani* distinguishable for other reasons. Second, we find that the challenged remarks do not run afoul of the rationale underlying *Doyle*, and we are not required to follow the decisions of other districts of the Illinois Appellate Court. *Maggio*, 2017 IL App (4th) 150287, ¶ 26. Third, even assuming the State's argument was improper, we do not believe that the defendant can satisfy the *Strickland* test.

¶ 95    Although the statement at issue in this case was similar to the statement at issue in *Gagliani*, we find that there is another, more significant distinction between the two cases. There, as we have just discussed, the cross-examination challenged by the defendant repeatedly focused on the fact that the defendant declined to offer an exculpatory story to police despite having ample opportunity to do so. See *Gagliani*, 210 Ill. App. 3d at 625. Here, by contrast, the State's closing argument emphasized the fact that although the defendant made statements to three different people—his father, Bess, and Agent Jennings—shortly after the shooting, he did not tell any of those people that he was afraid of Mayes or that he acted in self-defense. The focus was on what the defendant said and did not say within these statements, not on the opportunity the defendant had to say more. Viewing these arguments in context, as we must (see *People v. Ramos*, 396 Ill. App. 3d 869, 874 (2009)), we find that this argument was far less likely than the cross-examination at issue in *Gagliani* to unfairly lead jurors to hold the defendant's exercise of his right to remain silent against him.

¶ 96    It is also important to emphasize that the rationale underlying *Doyle* is that it is inconsistent with the protections in *Miranda* to allow the State to use a defendant's exercise of those rights against him. *Doyle*, 426 U.S. at 618-19 (citing *United States v. Hale*, 422 U.S. 171, 182-83 (1975)

29

(White, J., specially concurring)). We do not believe the arguments challenged here were inconsistent with the protections of *Miranda*. The exclusionary rule of *Miranda* only applies to statements made in response to police questioning; it does not apply to spontaneous statements. *People v. Acoff*, 188 Ill. App. 3d 208, 212-13 (1989). Thus, a statement that is unsolicited and spontaneous is admissible, even if it is made after a defendant invokes his right to counsel. *Miranda*, 384 U.S. at 478 (explaining that "[v]olunteered statements of any kind are not barred by the Fifth Amendment"). Here, the defendant's unsolicited statement to Agent Jennings was therefore admissible in spite of his invocation of his right to remain silent until counsel was present. As the State points out, the defendant does not contend otherwise. The State's commentary on this admissible statement does not run afoul of either *Miranda* or *Doyle*. To the extent that *Gagliani* is inconsistent with this conclusion, we decline to follow it. See *Maggio*, 2017 IL App (4th) 150287, ¶ 26.

¶ 97    Moreover, even if we were to accept the defendant's claim that the State's argument was improper, we would reject his claim of ineffective assistance of counsel because we find that he is unable to satisfy either prong of the *Strickland* test. As we discussed earlier, satisfying the first prong—which focuses on counsel's performance—requires a defendant to overcome a strong presumption that counsel's performance constituted sound trial strategy. *Strickland*, 466 U.S. at 689. Here, rather than objecting to the prosecutor's argument, an objection that may not have been sustained, defense counsel countered the argument. He reminded jurors that they heard evidence that the defendant was on suicide watch during the hours between his two statements to Agent Jennings, and he argued that the defendant was unlikely to have been focusing his attention on coming up with an untrue story during this time. He also emphasized that the defendant voluntarily

30

relayed his story to Agent Jennings only a few hours after giving his first statement. We find that this choice constituted sound trial strategy.

¶ 98    As we also explained earlier, to satisfy the second prong of the *Strickland* test—which requires the defendant to establish prejudice—the defendant must demonstrate a reasonable probability of a different outcome had counsel objected. *Id.* at 694. Here, as we have already discussed, voluminous evidence supported the State's theory of the case. It is also worth noting that nothing in *Doyle* required the prosecutor to refrain from arguing that if the defendant really feared for his life when he shot Mayes, he would have included this fact in his statements to Willie and Bess. As such, even a successful objection to the remarks addressing his initial statement to Agent Jennings would not have precluded the State from making essentially the same argument by focusing solely on his statements to Willie and Bess. We therefore conclude that the defendant is unable to satisfy either part of the *Strickland* test.

¶ 99    The defendant's final contention is that counsel was ineffective for failing to object to evidence of prior bad acts or to request a limiting instruction concerning that evidence. Because the defendant must satisfy both prongs of the *Strickland* test to prevail on his claim of ineffective assistance of counsel, we may reject his claim solely on the basis of his inability to satisfy the prejudice prong. *Id.* at 697.

¶ 100  The defendant challenges the evidence that he intentionally failed physical training requirements so he would qualify for IRR status and the evidence that he did not have a concealed carry permit. We do not believe this evidence was prejudicial enough to adversely affect the outcome of his trial. The defendant testified that he applied for IRR status so that he would be able to care for his newborn daughter and his ailing father. He explained that it was necessary for him to fail the physical training requirements in order to qualify. The defendant also told Agent

31

Jennings that his pistol was not a "concealable" weapon, and there was evidence that he did not normally carry a weapon. Because we find that a different outcome is not reasonably probable, we conclude that the defendant's claim of ineffective assistance of counsel must fail.

¶ 101                                    III. CONCLUSION

¶ 102   For the foregoing reasons, we affirm the defendant's conviction.

¶ 103   Affirmed.

2020 IL App (5th) 160458

NO. 5-16-0458

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 14-CF-1068 |
| | ) | |
| CALEB R. BAILEY, | ) | Honorable |
| | ) | Kyle Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**     July 23, 2020
_____

**Justices:**     Honorable Milton S. Wharton, J.

Honorable Thomas M. Welch, P.J., and
Honorable David K. Overstreet, J.,
Concur

_____

**Attorney**     N. Scott Rosenblum, Rosenblum, Schwartz, Rogers & Glass, PC, 120 S.
**for**     Central Avenue, Suite 130, St. Louis, MO 63105
**Appellant**

_____

**Attorneys**     Hon. Thomas D. Gibbons, State's Attorney, Madison County Courthouse,
**for**     157 North Main Street, Suite 402, Edwardsville, IL 62025; Patrick
**Appellee**     Delfino, Director, Patrick D. Daly, Deputy Director, Office of the State's
Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2,
P.O. Box 2249, Mt. Vernon, IL 62864

_____