THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN GAGLIANI, Defendant-Appellant.

Second District   No. 2—89—0319

Opinion filed March 12, 1991.

Robinson & Skelnik, of Elgin (Mary Robinson, of counsel), for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Steven Gagliani, was charged by indictment with home invasion (Ill. Rev. Stat. 1987, ch. 38, par. 12—11), residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 19—3), armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)), and two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1)). Following a jury trial, defendant was found guilty of each offense and was sentenced to 30 years' imprisonment for home invasion and each sexual assault conviction, along with eight years for residential burglary, each term to run concurrently. In addition, defendant was sentenced to 12 years' imprisonment for armed robbery to run consecutive to the other convictions. Defendant filed a timely notice of appeal.

On appeal, defendant contends that he was denied a fair trial when the State's Attorney improperly cross-examined him concerning his failure to volunteer information to police officers after he was given his *Miranda* warnings. In addition, defendant asserts that the trial court erred in sustaining one of the State's hearsay objections at trial and that the court abused its discretion in sentencing him to the lengthy terms of incarceration. We reverse and remand.

The following evidence was adduced at trial. The victim, Gwen, testified that she returned home from work on August 2, 1988, at approximately 10:10 p.m. Gwen went into her bedroom shortly after she arrived home and turned on her air conditioner due to the heat. However, she turned the air conditioner off before she went to bed because it wasn't working properly. Gwen indicated that she was wearing underwear, a bra and a T-shirt when she went to bed, but removed her bra and T-shirt "because it was real hot." She fell asleep watching television but woke up when she heard a noise in her house. It was at this time that Gwen saw defendant in her bedroom.

Gwen stated that she then asked defendant what he was doing in her house, and defendant told her "to shut up or he would smash [her] brains in." Defendant had a nightstick in his hand at this time. Defendant attempted to turn off the television set and told Gwen not to look at him while he did so. However, Gwen managed to see defendant's reflection in the mirrors located near the television set.

After turning off the television, defendant told Gwen to come to the edge of the bed and to put his penis in her mouth. Defendant told Gwen that he would kill her if she did not do what he said. Defendant then got into bed with Gwen and forced her to engage in more oral sex. Thereafter, defendant told Gwen to remove her underwear, and defendant proceeded to have vaginal intercourse with her. Defendant had the nightstick in his hand at all times during the assault.

Defendant then told Gwen that he wanted her car keys, and he followed her downstairs to get them. Gwen gave the keys to defendant, opened the front door for him, and was told that she would be killed if she called the police. After defendant got her car started and drove away, Gwen attempted to call the police, but her phone wasn't working. She got dressed, went over to a neighbor's house and asked her neighbor to call the police. The police arrived shortly thereafter, and Gwen was taken to a local hospital via an ambulance for an examination.

The following day, Gwen went to the Glendale Heights police department to get her car back. While she was there, she was asked to view six black and white photographs to assist the officers in their investigation. Gwen identified defendant from the photographs as the perpetrator of the offenses.

Gwen further testified that defendant removed money, a watch and a ring from her house that night. She also stated that she had never seen defendant before that night and that he did not have permission to be in her home. In addition, Gwen never consented to having sex with defendant.

On cross-examination, Gwen testified that the nightstick that defendant used to threaten her was actually hers. Defendant did not hit her with the nightstick but only used it to threaten her. Gwen also stated that she picked up a paring knife, with a two-inch blade, immediately after she first saw defendant in her room, but dropped it after defendant told her not to "even think about it." Gwen also noted that a screen in one of her basement windows was cut in two different places, although it was not in that condition before August 2, 1988.

Jerome Zacny testified that he was Gwen's neighbor who assisted her during the early morning hours of August 3, 1988. Zacny stated that he was awakened by a pounding at his front door. Zacny opened the door and saw Gwen standing outside. Gwen "had a very frightened look on her face" and told Zacny that someone had just broken into her house. Zacny then went into his kitchen to call the police. After the telephone call, Gwen told Zacny, along with his two daughters, that a young, white male had raped her that night.

Officer Ronald Kirstein of the Glendale Heights police department testified that he responded to Zacny's telephone call and arrived at Zacny's house at approximately 1:45 a.m. on August 3, 1988. Officer Kirstein met with Gwen and described her as emotionally upset, crying, and depressed. Following a short conversation, Gwen and Kirstein went to Gwen's house. Kirstein observed an open window in the basement with the screen torn near the latches.

On cross-examination, Officer Kirstein stated that Gwen told him that she was unable to see the intruder's face that night. Gwen also made no reference to observing defendant's face through a reflection in the mirror. In addition, Kirstein did not observe any cuts, scratches or bruises on Gwen's face.

Detective Gary Harrison of the Glendale Heights police department testified that he performed a "walk-through" investigation at Gwen's house in the early morning hours of August 3, 1988. Detective Harrison observed an open window in the basement, with two holes punched in the screen. In addition, there was a purse, two jewelry boxes, and some jewelry lying on the basement floor. Harrison also obtained several latent fingerprint lifts from Gwen's house, including lifts from her television and automobile. Detective Harrison then spoke with Gwen later that morning at the hospital. Gwen appeared to be upset and withdrawn during the conversation.

Later that afternoon, Detective Harrison received a telephone call from the crime lab concerning the fingerprint lifts. Based on information received from the lab, Harrison prepared a photographic lineup for Gwen to view. Gwen picked defendant's photograph out of the six photographs which appeared in the lineup.

At approximately 4 p.m. on August 4, 1988, Detective Harrison, along with another detective, went to defendant's house. Defendant lived near Gwen's house in Glendale Heights. Detective Harrison spoke with defendant and told him that defendant had been identified, through a photographic identification and fingerprint match, as the perpetrator of an "incident" at Gwen's house. Harrison read defendant his *Miranda* rights and asked him why his fingerprint was found in the house and why he was identified from a lineup. Defendant indicated that he did not know what Harrison was talking about and that he "didn't have anything to do with the incident." The officers then left defendant's house.

On August 4, 1988, Detective Harrison obtained an arrest warrant and proceeded to arrest defendant. Defendant was taken to the Glendale Heights police department, was permitted to telephone his mother, and was then read his *Miranda* rights. Defendant signed a

preprinted card indicating that he understood each of his rights. Defendant continued to deny any involvement in the offenses. After a short period of time, defendant began to cry and told Detective Harrison that "he did it." Defendant stated that he could not have told Harrison earlier in the day because his mother was present. Defendant intended to burglarize the house that night, but "he didn't know what happened" to him when he saw Gwen lying on her bed with only her underwear on. Defendant also indicated that he was drunk that night and that he felt "so bad for that lady."

On cross-examination, Detective Harrison testified that he suspected defendant may have perpetrated the offenses even before the fingerprint results came back from the crime lab. In addition, defendant did not put any of his statements concerning his confession following the arrest into writing. In addition, even though defendant told Harrison that he was drunk that night, Gwen did not smell alcohol on defendant's breath.

Christine Sahs, a forensic chemist for the Du Page County sheriff's department, testified that she examined the vaginal smear taken from Gwen at the hospital and determined that it contained the presence of spermatozoa.

Detective Paul Sahs of the Du Page County sheriff's department testified that he compared the latent fingerprint lifts taken from Gwen's house to those found on defendant's fingerprint card and found them to match. In particular, Detective Sahs observed matches on the prints lifted from the television set and automobile. On cross-examination, Sahs indicated that no latent prints were found on the nightstick.

Following the admission of stipulated testimony, the State rested. The first witness for the defense was Bernadette Gagliani, defendant's mother. Mrs. Gagliani testified that she was at home on August 4, 1988, at approximately 4 p.m. when Detective Harrison arrived at her house. Harrison, along with his partner, told Mrs. Gagliani and defendant what had happened to Gwen and indicated that defendant may have been involved. Harrison read defendant his *Miranda* rights, and defendant told the officers that he did not know anything about the crimes.

After the officers left, Mrs. Gagliani made an appointment with an attorney to discuss the situation. After defendant spoke with an attorney, he and his mother returned home. Defendant left shortly thereafter to attend his class at a local college. Detective Harrison returned to the Gagliani residence about 30 minutes after Mrs. Gagliani arrived and told her that he had an arrest warrant for defendant.

Mrs. Gagliani told Harrison where he could find defendant. Defendant telephoned Mrs. Gagliani nearly two hours later and told her he was in police custody.

Defendant testified at trial that he was 18 years old on August 3, 1988, was unemployed, and was attending classes at the College of Du Page. Defendant stated that he had four previous felony convictions, two involving theft of automobiles and two involving possession of stolen motor vehicles. Defendant pleaded guilty to each offense.

Defendant also stated that he met Gwen at a local grocery store parking lot approximately six weeks before he was arrested for this offense. Defendant assisted Gwen in loading groceries into her car, and Gwen recognized him as being one of her neighbors. Although defendant did not initially recognize her, he later realized that they were neighbors after she told him where she lived. Gwen gave defendant a ride home from the grocery store and invited him into her house to have a beer with her. Defendant left the house after he finished his beer.

Defendant went to Gwen's house approximately three other times before he arrived at 10 p.m. on August 2, 1988. On this day, defendant went downstairs and sat on the sofa next to Gwen. They "started talking and stuff and started messing around." Defendant removed Gwen's jeans in the basement, and they then went upstairs to have sex. Following the sexual activity, defendant asked Gwen if he could borrow her car to get cigarettes. Gwen became upset but eventually allowed him to use the car. Defendant took the car to a local 7-Eleven and returned about 15 minutes later. At this time, defendant observed a police squad car in Gwen's driveway. Defendant stated that he "didn't know what was going on" and "got scared" because he was on felony probation at that time. Defendant parked the car down the street, left the keys in the car, and went home.

Defendant also indicated that he had sex with Gwen on three separate occasions before August 2, 1988. In addition, he also borrowed her car twice before he did so on the night in question.

Defendant then stated that Detective Harrison, along with his partner, came to defendant's house on August 4, 1988, to investigate a home invasion and sexual assault. Defendant told the officers that he did not know what they were talking about. After the officers left, defendant and his mother went to speak to an attorney. Later that night, defendant was placed under arrest. Defendant denied making any statements to Detective Harrison following his arrest.

On cross-examination, defendant testified that he told Detective Harrison during the initial interview that he did not know anything

about a home invasion or sexual assault. In addition, he told Harrison that he did not know how his fingerprints could be found in Gwen's house, even though he had been in the house on four or five different occasions and actually did know how his prints got in the house.

Following defendant's testimony, the defense rested. The State recalled Gwen in rebuttal, and she testified that she rarely goes into the basement because she is allergic to a cat which lives in the basement. Following Gwen's brief testimony, both sides rested. After closing arguments, the jury returned guilty verdicts as to each offense charged. Defendant's motion for a new trial was denied, and the court sentenced defendant to the previously mentioned terms of imprisonment. This appeal followed.

Defendant first contends that he was denied a fair trial when the State's Attorney repeatedly cross-examined him concerning his failure to offer an exculpatory version of events to the police officers during the initial questioning. Defendant argues that the improper questioning violated the holding of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, and deprived him of due process of law.

■■ In *Doyle*, the Supreme Court held that the State could not impeach a defendant's exculpatory story by cross-examining the defendant about his failure to tell the story to police officers following his arrest and subsequent *Miranda* warnings. (*Doyle*, 426 U.S. at 611, 49 L. Ed. 2d at 94, 96 S. Ct. at 2241.) The Court determined that *Miranda* requires such a result due to the fundamental unfairness which would occur if post-arrest silence could be used to impeach a defendant's testimony at trial. 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.

In *Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124, the Court clarified the *Doyle* decision and determined that *Doyle* does not apply in situations in which *Miranda* warnings were not given. *Jenkins*, 447 U.S. at 240, 65 L. Ed. 2d at 96, 100 S. Ct. at 2130; see also *Fletcher v. Weir* (1982), 455 U.S. 603, 607, 71 L. Ed. 2d 490, 494, 102 S. Ct. 1309, 1312 (cross-examination concerning a defendant's post-arrest silence is permissible if *Miranda* warnings have not been administered).

Defendant points out that the statements in *Doyle* were very similar to those present in this case. In *Doyle*, the defendant testified at trial that he was innocent of any criminal wrongdoing and that the charges were the result of a "frame-up." On cross-examination, the prosecutor asked the defendant why he did not tell the police officers about the frame-up or protest his innocence following his arrest. The defendant noted that he only asked the officers "[w]hat's this all

about?" (*Doyle*, 426 U.S. at 614-15 n.5, 49 L. Ed. 2d at 96 n.5, 96 S. Ct. at 2243 n.5.) The defendant's response occurred after he was placed under arrest and read his *Miranda* rights.

In the case at bar, defendant was read his *Miranda* rights, even though he was not initially placed under arrest, and was asked what he knew about the incident. Defendant responded that he did not know what the officers were talking about. In addition, defendant also told the officers that he did not know how his fingerprints could have gotten in Gwen's house. At trial, defendant admitted to being in Gwen's house on the night in question and indicated that they engaged in consensual sexual intercourse that night.

The questions which form the basis for defendant's first contention on appeal occurred during the State's cross-examination of defendant with respect to his failure to tell Detective Harrison about the events as he testified to at trial. The questions concerning defendant's prearrest discussion with Harrison included:

"This was your opportunity at that point in time, was it not, to tell Gary Harrison you were at the home on August 2nd and August 3rd?

* * *

You had the opportunity on August 4th of 1988 to tell Gary Harrison that you didn't do this home invasion and you were not a part of this rape, didn't you?

* * *

You didn't ask Gary Harrison or Commander Bosh to step aside so that you could tell them your version of what went on, did you?"

The trial court sustained defendant's objections to each of these questions. The State continued this line of questioning to include defendant's post-arrest opportunity to proclaim his innocence to Harrison by asking defendant: "[s]o this was another opportunity where you had to tell the police what happened that night." Defendant's objection to this question was also sustained.

The State raises several arguments to support its contention that the cross-examination questions did not deny defendant a fair trial in this case. The State argues that: (1) defendant waived the issue because it was not raised in his post-trial motion; (2) no prejudicial error occurred in the cross-examination; (3) the "Tacit Admission Rule" applies; and (4) any error was harmless beyond a reasonable doubt. We will address each of the State's arguments in turn.

■■ With respect to the State's waiver contention, we note that the State correctly points out that defendant failed to raise the al-

leged *Doyle* violation claim in his motion for a new trial. The failure to raise an issue in a motion for a new trial constitutes waiver of the issue on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-87, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274; *People v. Holmes* (1989), 198 Ill. App. 3d 766, 778.) However, the waiver rule does not apply in cases in which plain error is present. Pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), this court may take notice of any errors which affect substantial rights, even if those errors were not brought to the trial court's attention. (*People v. Britz* (1988), 123 Ill. 2d 446, 486, *cert. denied* (1989), 489 U.S. 1044, 103 L. Ed. 2d 242, 109 S. Ct. 1100; *Enoch*, 122 Ill. 2d at 189.) Other court decisions have determined that a potential *Doyle* violation, in cases in which the evidence is closely balanced, should be treated as plain error for purposes of review. (See *People v. Nolan* (1987), 152 Ill. App. 3d 260, 264; *People v. McMullin* (1985), 138 Ill. App. 3d 872, 876.) We find the evidence in this case to be closely balanced. Thus, we will review this issue raised as a matter of plain error.

■ We agree with defendant's contention that the cross-examination was improper in this case in that it violated the holding in *Doyle*. Defendant was read his *Miranda* rights, although he was not initially placed under arrest, and was asked if he knew anything about the alleged crimes. At trial, defendant was cross-examined about why he did not tell the police officers the account of events which he offered at trial. This cross-examination was improper because it suggested that defendant's trial testimony was fabricated due to the fact that he could have told the police officers the same story during the investigation but did not. However, defendant had a constitutional right to remain silent. (*Miranda v. Arizona* (1966), 384 U.S. 436, 479, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630; see also *United States v. Hale* (1975), 422 U.S. 171, 177, 45 L. Ed. 2d 99, 105, 95 S. Ct. 2133, 2137.) As *Hale* pointed out, the silence following *Miranda* warnings can easily be taken to mean that the suspect was exercising his right to remain silent, as opposed to the inference that the explanatory testimony at trial was a recent fabrication. (*Hale*, 422 U.S. at 177, 45 L. Ed. 2d at 105, 95 S. Ct. at 2137.) Thus, it is our opinion that the cross-examination at issue in the present case violated the due process clause of the fourteenth amendment because it improperly commented upon defendant's exercise of his constitutional right to remain silent. See *Doyle*, 426 U.S. at 619, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.

We find support for our decision in several Illinois cases. In *People v. Malkiewicz* (1980), 86 Ill. App. 3d 417, this court determined that the defendant's constitutional rights were violated when the State's

Attorney improperly commented on the defendant's failure to make an exculpatory statement following arrest. (*Malkiewicz*, 86 Ill. App. 3d at 420.) The court noted that the defendant's credibility was an essential part of the case because he was using a consent defense to a rape charge, and thus the comments concerning his post-arrest silence were especially prejudicial because they implied that the defendant had fabricated his consent defense at trial. 86 Ill. App. 3d at 420-21.

Likewise, in *People v. Adams* (1981), 102 Ill. App. 3d 1129, this court determined that the State's cross-examination of the defendant resulted in reversible error. We noted that it was highly improper for the State to suggest that "if defendant were innocent she would have so informed the officers immediately after her arrest, and it gave the jurors a basis from which they might conclude that her defense in trial was fabricated." *Adams*, 102 Ill. App. 3d at 1133.

■ Furthermore, we disagree with the State's argument that any error which occurred during cross-examination was not prejudicial and was thus harmless beyond a reasonable doubt. As we previously indicated, the evidence in this case was closely balanced. The jury in this case was, by necessity, required to determine whether Gwen or defendant was a more credible witness. Given that defendant's credibility was integral to his defense of consent, the improper cross-examination became substantially prejudicial because it gave the jurors an impermissible basis to conclude that his testimony at trial was fabricated and thus incredible. See *Adams*, 102 Ill. App. 3d at 1133; *Malkiewicz*, 86 Ill. App. 3d at 421.

■ We also disagree with the State's contention that the tacit admission rule applies in this case. This rule, as stated in *People v. Bennett* (1954), 3 Ill. 2d 357, provides that an admission may be implied from the conduct of a party charged with an offense who remains silent when "one states in his hearing that he was concerned in the commission of the crime, when the statement is made under circumstances which allow an opportunity to him to reply and where a man similarily [sic] situated would ordinarily deny the imputation." (*Bennett*, 3 Ill. 2d at 361.) We note, however, that *Bennett* was decided before *Miranda* and *Doyle*. Thus, its holding that silence when accused with criminal activity can be used as an implied admission has been discredited. See *People v. Rehbein* (1978), 74 Ill. 2d 435, 441, *cert. denied* (1979), 442 U.S. 919, 61 L. Ed. 2d 287, 99 S. Ct. 2843 (adoptive admission cases have been discredited); *People v. Cihak* (1988), 169 Ill. App. 3d 606, 614; *Nolan*, 152 Ill. App. 3d at 267.

In summary, we believe that the State improperly cross-examined defendant about his silence *after* he was read his *Miranda* rights. This

attempt to impeach defendant's exculpatory testimony at trial violated defendant's due process rights and was done in contravention of the holding in *Doyle*. This error was prejudicial, and thus not harmless, due to the importance of defendant's credibility at trial and the closely balanced evidence present in this case. Consequently, defendant is entitled to a new trial based upon this error.

We will also consider defendant's other appellate contention as it may arise again on retrial. Defendant argues that the trial court erred in precluding him, based on the State's hearsay objection, from adducing evidence of an allegedly material omission in Gwen's statement. The statement at issue involved whether Gwen told the police officers during their investigation that she saw defendant's face in her mirror before the assault.

At trial, Gwen testified that she saw defendant's face in her mirror as defendant was attempting to turn off the television set. On cross-examination, she was unsure whether she had told the investigating officers that she had seen his face. However, she did indicate that she believed she told Detective Harrison that she saw defendant's face in the mirror. When Detective Harrison testified, defense counsel asked him whether Gwen told him that she saw a reflection of defendant's face in the mirror. The trial court sustained the State's hearsay objection.

■ Defendant acknowledges that he failed to include this issue in his post-trial motion, but requests us to address it as plain error pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). Defendant argues that the court's ruling effectively precluded him from completing an impeachment of Gwen and had the effect of bolstering her credibility at trial.

We have already determined that the evidence was closely balanced in this case. Thus, we will also address this issue as a matter of plain error.

■ Defendant correctly points out that a defendant in a criminal case is entitled to effectively confront his accusers by the use of cross-examination. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 295, 35 L. Ed. 2d 297, 308-09, 93 S. Ct. 1038, 1046.) However, this right is not absolute. *Chambers*, 410 U.S. at 295, 35 L. Ed. 2d at 308-09, 93 S. Ct. at 1046.

In the present case, defendant attempted to impeach Gwen's testimony concerning her identification of him by showing that Detective Harrison failed to mention the identification process in the police report. Although the questioning on cross-examination, along with the arguments on the State's hearsay objection, were very confusing,

defendant apparently wanted to impeach Gwen's testimony based on an omission in the police report.

■■ In general, police reports may be used for impeachment purposes but are inadmissible as substantive evidence. (*People v. Johnson* (1982), 110 Ill. App. 3d 965, 969; *People v. Banasik* (1981), 93 Ill. App. 3d 612, 616.) However, these reports can only be used to impeach the officer who actually wrote the report. *People v. Gomez* (1982), 107 Ill. App. 3d 378, 382; *People v. Spain* (1980), 91 Ill. App. 3d 900, 905.

■■ We agree with the trial court's ruling in this case that defendant could not use Detective Harrison's police report to impeach Gwen's testimony. As the court properly observed:

> "There are two different things, one thing is whether or not she gave a statement to the police officer and the other thing is whether if such a statement was given, if it was put in the police report. And you are asking about what was put in the police report.
> ***
> [Detective Harrison] may not have put it in the police report if [Gwen] made that statement to him. It is possible that she made a statement to him that he did not put in the report."

Simply because Detective Harrison failed to mention how Gwen identified defendant in no way calls into question Gwen's identification of defendant in her bedroom mirror. Instead, this omission can only be used in an attempt to impeach Detective Harrison. On retrial, defendant may not use the apparent omission in the police report to impeach Gwen's testimony in any manner. Defendant may, however, ask Detective Harrison whether Gwen made a statement to him concerning the identity of the attacker.

■■ Defendant also contends that his sentence was excessive under the specific facts in this case. Because we have already determined that defendant is entitled to a new trial, we need not resolve this issue on appeal. We further find that remanding this case for a new trial will not subject defendant to the risk of double jeopardy because, in our opinion, the evidence presented was sufficient to support defendant's convictions. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309; *People v. Walters* (1989), 187 Ill. App. 3d 661, 669-70.

For these reasons, the judgment of the circuit court of Du Page County is reversed, and this cause is remanded for a new trial.

Reversed and remanded.

WOODWARD and NICKELS, JJ., concur.