NOTICE
Decision filed 05/08/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220296

NOS. 5-22-0296, 5-22-0307 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | Nos. 20-CF-99, 20-CF-110 |
| | ) | |
| DONALD LANGSTON, | ) | Honorable |
| | ) | Charles C. Hall, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court, with opinion.
Justices Welch and Cates concurred in the judgment, with opinion.

**OPINION**

¶ 1 Following a jury trial, the defendant, Donald Langston, was convicted on three counts of home invasion with a dangerous weapon (720 ILCS 5/19-6(a)(1) (West 2022)) and three counts of home invasion causing injury (*id.* § 19-6(a)(2)). For purposes of sentencing, the six counts of home invasion merged into one, and the defendant was sentenced to 20 years in the Illinois Department of Corrections, followed by 18 months of mandatory supervised release. The record indicates the trial court found that the conduct leading to conviction resulted in great bodily harm pursuant to section 3-6-3(a)(2)(iii) of the Unified Code of Corrections (730 ILCS 5/3-6-3(a)(2)(iii) (West 2022)), which mandated that the defendant must serve at least 85% of his sentence. The trial court also found that the same conduct caused severe bodily injury to two of the victims, which mandated the 20-year sentence to run consecutive to the concurrent 5-year sentences in Vermilion County

1

case No. 20-CF-99, a case arising out of the same incident in which the defendant was convicted of two counts of aggravated battery with a deadly weapon (720 ILCS 5/12-3.05(f)(1) (West 2022)). The sentence on aggravated battery was to be served at 50%. The defendant appeals from the judgment and sentences imposed in both cases. In the interest of judicial economy, we have consolidated the appeals.

¶ 2    On appeal, the defendant argues that (1) the State failed to prove him guilty of home invasion beyond a reasonable doubt, where the State's evidence supporting an element of home invasion (*i.e.*, that he did not have authority to enter the house) was severely impeached, (2) the trial court erred in imposing mandatory consecutive sentences where the record failed to support a finding of severe bodily injury, and (3) the imposition of an aggregate 25-year sentence was improper where it amounted to a life sentence and the trial court failed to properly balance the aggravating and mitigating factors. For the following reasons, we affirm.

¶ 3                                I. Background

¶ 4    The defendant and Meagan Langston Poole were married in June 2006. In 2019, Meagan decided the relationship was over and moved out of the marital home into her parents' home. At the time of the incident, they were still married. Although it is not clear when, at some point, Meagan became the owner of her parents' house. Meagan testified that the defendant was "distraught" when she decided to break up. In December 2019, in an attempt to be nice, Meagan invited the defendant over to her parents' home for Christmas. Meagan testified that around New Year's Eve, she made it clear to the defendant that he was no longer welcome at her parents' home.

¶ 5    On the evening of February 7, 2020, Meagan had gone to the grocery store to buy ingredients to make dinner. When she returned, she cooked dinner for her family. When Robert Poole, Meagan's boyfriend at the time, got home from work, he went upstairs to Meagan's

2

bedroom. After making dinner, Meagan took her plate of food upstairs to her bedroom. When she got upstairs, she realized she had forgotten her drink in the car and asked Faith Burkett to get it. Faith Burkett was dating Meagan's son, Damian. When Faith went outside to the backyard and opened the gate, she saw the defendant. He approached Faith, grabbed her arms, and asked, "Where's Meagan?" Faith told him that she did not know. The defendant proceeded to go inside the house.

¶ 6    Meagan's mother, Kathy Martin, was in the kitchen when the defendant opened the back door to her home and came in. Kathy testified that the defendant said, "Hi, how you doing?" and then "rushed and went up the stairs." She also testified that she did not invite the defendant into her home and stated that he was not supposed to come in.

¶ 7    Keenan Martin, Meagan's son, testified that while he was eating dinner in the dining room, the defendant walked into the kitchen from the back door and proceeded up the stairs. He stated that he was startled because the defendant was not supposed to be there. Keenan told the defendant, "You do not want to go up there," but the defendant kept walking, so Keenan followed him.

¶ 8    Meagan was sitting on the bed looking at her phone, while Robert was asleep next to her. Robert's daughter and granddaughter were sitting in the chair next to the bed watching television. Meagan heard the bedroom door slam and saw the defendant standing there, wearing a large, blue Carhartt jacket. The defendant smiled at her, tilted his head to one side, and said, "Well, hello, Ms. Langston." She asked who let him in the house, and he responded, "I did." At that point, the defendant unzipped his jacket, and Meagan saw the handle of a metal baseball bat. The defendant reached into his jacket for the bat and lunged at her. Meagan testified that the defendant had brought the bat into the house. She stated that he came towards her with the bat and swung it at her head. She put her arm up to protect herself, but the defendant struck her arm and the top of her

3

head with the bat. Meagan testified that she felt an "intense burning sensation" on the top of her head where the bat struck. At trial, she pointed to a scar on her head, which was difficult to see because of her hair.

¶ 9 After the defendant struck her, he turned to swing the bat at Robert, who was just starting to wake up and roll over. The defendant struck Robert in the forehead with the baseball bat. Meagan testified that Robert's head "split open," and the defendant turned back to her and swung again. This time Meagan ducked, the defendant hit the back of her shoulder, and the tip of the bat hit her on the cheek. The force of the blow threw Meagan to the floor. She heard the bedroom door open, so she jumped up and ran down the stairs and out of the house to hide because she did not know if the defendant was still behind her. She went to a neighbor's house to call the police.

¶ 10 Meagan was on the phone with 9-1-1 when she saw the defendant coming towards her. When he reached her, the defendant grabbed her and put her into a headlock. He put his hand in her mouth and tried to pull her jaw down. Her shirt was soaked from the blood from her head wound. When Meagan saw the police lights approaching, the defendant released her and "calmly walked away." The parties stipulated that Meagan was treated at Sacred Heart Medical Center for a laceration to the scalp. Photographs of Meagan's injuries were admitted into evidence.

¶ 11 On cross-examination, Meagan acknowledged that for years family members were allowed to come and go unannounced from her parents' home without knocking. She testified that a few days after the incident, she spoke with Investigator Cade with the Hoopeston Police Department and provided a statement about what had occurred. She did not recall whether she told him that, around New Year's Eve, she had told the defendant he was no longer able to be at her parents' home.

4

¶ 12    At the time of the defendant's trial, Robert Poole was married to Meagan. He testified that on the evening of February 7, 2020, he left work early because he was not feeling well. When he got to Meagan's parents' house, he went to her bedroom to lie down and fell asleep. He woke up when he heard the door slam and a strange man's voice in the bedroom. Robert heard Meagan speaking to the man, but he was still groggy and did not recall what was said. When he rolled over, he saw the defendant with an aluminum baseball bat in his hand, raised up over his head. Robert attempted to lunge from his position on the bed to stop the defendant. As he did, the defendant hit Robert in the face with the bat, knocking Robert back onto the bed. Robert testified that "blood was everywhere." He attempted to wipe the blood from his eyes. Robert found a T-shirt on the floor and tied it around his head. He was dazed, but not knocked out. He left the bedroom to go downstairs, but everything "went white" as he started to go down the stairs. Robert heard someone downstairs say that the defendant was out of the house, so he went back to the bedroom and sat in a chair and waited for the EMTs to arrive. The parties stipulated that Robert was treated at Carle Hospital for a laceration of the forehead and was diagnosed with an acute fracture of the frontal sinus bone of the skull. He received several layers of stitches in his forehead from the wounds. At the time of trial, Robert still had a scar on his forehead from his nose to his hairline. Photographs of Robert's injuries were admitted into evidence.

¶ 13    By the time Keenan got to the top of the stairs, the defendant had already gone into the bedroom and slammed the door. He heard the defendant say, "Well, hello, Ms. Langston" and then he heard his mother scream. He then saw his mother coming out of the room with the defendant following her, carrying a baseball bat. Keenan testified that he had never seen the baseball bat prior to the incident. Keenan stated that the defendant hit him on the forehead with the baseball bat as he left the bedroom. Keenan attempted to fight back with a small whittling knife, but the defendant

5

blocked it. Keenan and the defendant wrestled for several minutes, but Keenan was unable to disarm him. Keenan stated that the defendant then released the bat, but it took a couple of minutes for Keenan to recover because he was dizzy from being hit with the bat by the defendant. When Keenan recovered, he went downstairs and charged at the defendant in an attempt to subdue him, striking the defendant with the baseball bat. Before Keenan could hit the defendant again, his brother, Damian, came down the stairs and jumped on the defendant. Keenan testified that at this point, the defendant pulled a rifle out from his jacket and aimed it at Damian. Damian grabbed the gun and threw it across the room. They later learned that it was a pellet gun. Keenan testified that he had never seen the pellet gun in his house before. He stated that the defendant then pulled out a knife from his pocket, but Damian grabbed the knife and threw it also. Damian then pushed the defendant out the door.

¶ 14    When Keenan realized that his mom was not in the house, he began looking for her. When he went out to the street, he heard her screaming from a few houses down, so he ran to her. By the time he arrived, the defendant was gone. The police arrived shortly after. In addition to the injury to his forehead, Keenan also suffered an injury to his arm as he attempted to defend himself. The parties stipulated that Keenan was treated at the hospital for his injuries. Photographs of Keenan's injuries were admitted into evidence. At trial, Keenan indicated that he had a scar on the forehead where the defendant had hit him. On cross-examination, Keenan acknowledged that he had not reported to Investigator Cade that his mother had told the defendant he was not welcome at the home.

¶ 15    Meagan's son, Damian Martin, testified that he was at his grandparents' home, playing video games with some friends, when he heard his brother, Keenan, yell "Call 911." As he was heading down the hallway, he saw Robert coming out of the bedroom, covered in blood. When

6

Damian ran downstairs, he saw Keenan and the defendant fighting over the baseball bat. Damian recognized the bat as the one he used to play baseball with that he kept at the defendant's house. Damian had never seen the bat at his grandparents' house. Damian ran at the defendant and pushed him out the door. He then went to look for his mother. He heard her screaming outside from a neighbor's house. He saw the defendant was attacking her again, with his hand in her mouth, trying to pry her jaw open. Damian arrived at the same time as the police and saw the defendant take off down the street.

¶ 16    Concepsion Palomo testified on behalf of the State. Palomo was employed at H&R Block in Hoopeston, Illinois. She had gotten to know the defendant and Meagan through her employment. She had prepared their taxes for approximately three years. On February 6, 2020, the day before the incident, the defendant came to her office to get his taxes done. When she asked about his marital status, the defendant told her that Meagan had left him and that he was sad and upset about it. He told Palomo that he thought about doing bad things. She stated that he told her that he thought about getting a bat and "taking it to them." Palomo testified that the defendant told her that he wanted to hurt Meagan like she had hurt him. The State admitted into evidence a tax document signed by the defendant on February 6, 2020, which was the day he met with Palomo.

¶ 17    On cross-examination, Palomo conceded that the defendant did not state that he had a plan to do anything bad, but that he admitted thinking about it. Palomo could not recall if she had reported to the investigator that the defendant said that he wanted to hurt Meagan like she hurt him.

¶ 18    Investigator Ron Cade testified on behalf of the State. Cade testified that he responded to a call regarding the incident on February 7, 2020, and he interviewed the defendant at the police department. He could smell alcohol on the defendant during the interview. On cross-examination,

7

Cade testified that, as part of his investigation, he also interviewed other individuals. He stated that he did not note in his report that Meagan had mentioned that the defendant was not allowed to come back to her parents' house. Cade acknowledged that it was something he would have expected to know since he was investigating the possibility of a home invasion. When asked if Palomo had reported to him that the defendant had stated, "I wanted to hurt her the way she hurt me," Cade testified that the exact quote was not contained in his report. However, on redirect examination, Cade testified that Palomo had reported to him that the defendant told her, "I just think about taking a bat to them," and "It hurt, and I just want to take a bat to them." Defense counsel objected to the hearsay testimony. The trial court, noting defense counsel's continuing objection, overruled it and allowed the testimony.

¶ 19 Later, outside of the presence of the jury, defense counsel clarified to the trial court that his intention in questioning Investigator Cade was to perfect an impeachment because Palomo indicated that the defendant used the quote "I wanted to hurt her the way she hurt me." Defense counsel explained that when he asked Palomo whether she had provided the quote to Cade, she said she did not remember; thus, he was attempting to have Cade testify that Palomo never made that statement. Defense counsel argued that this was not an invitation for the State to then introduce Palomo's other statements to Cade. The State responded that Palomo could not be impeached by a general statement given to Cade that the defendant told her that he was going to hurt Meagan the way she hurt him. The trial court stood by its earlier ruling.

¶ 20 The defendant testified on his own behalf. On direct examination, the defendant admitted that on the evening of February 7, 2020, he was in Meagan's room and that he swung the bat, causing injuries to her and Robert. He also admitted that, once back in the hallway, he swung the bat at Keenan, causing injuries to him.

8

¶ 21    At the time of the incident, the defendant was married to Meagan. They had been married over 13 years but had been together over 15 years. He had helped Meagan raise her six children and had been a father figure to them. He testified that he called Meagan's parents "mom and dad." The defendant testified that, on the night of the incident, Meagan was the owner of the house. She lived there with her kids and her parents. He testified that he had gone in and out of that house for many years. He also testified that prior to February 7, 2020, Meagan had never told him that he was not allowed to be in the house. Nor had anyone else told him that he was not allowed to be in the house.

¶ 22    The defendant testified that, on the evening in question, he had drank a six-pack of beer at approximately 6 p.m. that night. He was in his backyard with his pellet gun looking for raccoons that were getting in his garbage can. While he was outside, he decided to walk from his house to Meagan's house, which was a few blocks down the street, to retrieve a heater he had loaned her. He testified that instead of taking the pellet gun back inside his home, he put it in his coat.

¶ 23    The defendant stated that when he arrived at Meagan's house, he saw Faith and asked where Meagan was. When she stated that she did not know, the defendant walked into the house from the back porch like he normally would. He did not knock or announce himself. He saw Meagan's mother in the kitchen, spoke to her, but kept on walking. Kathy did not say anything to the defendant. In the dining room, he saw Keenan, who told the defendant that he did not want to go up there. He went upstairs to Meagan's bedroom because that is where his heater was located.

¶ 24    When the defendant got to the top of the stairs, he saw a dog cage outside of the bedroom, with a baseball bat lying on it. He testified that when he opened the bedroom door and saw Meagan with Robert, he "just kind of lost it" because he was not expecting Robert to be there. He grabbed the baseball bat that was outside of the bedroom. He testified that when he went to Meagan's

9

house, he did not have the intention to hurt anyone or to commit any crime inside the house. The defendant denied carrying the baseball bat with him to Meagan's house. On cross-examination, the defendant admitted to having the pellet gun in his jacket when he went upstairs to Meagan's room. The defendant denied telling Palomo that he thought about hurting Meagan.

¶ 25    The jury found the defendant guilty on all counts. On May 6, 2022, a sentencing hearing was held. The State sought the maximum sentence of 30 years on the home invasion charge, arguing, *inter alia*, that the three victims all went to the hospital for treatment of the injuries the defendant had inflicted on them; the defendant's actions were premeditated based on the fact that he brought the aluminum baseball bat into the house; and the defendant previously had been convicted of attempted armed robbery. The defendant argued, among other things, that the attempted armed robbery conviction was more than 30 years old and that, although Meagan and Robert received "a laceration" and Robert received some broken bones, none of their injuries were life-threatening, nor was there evidence of ongoing or long-term physical issues. No additional testimony regarding the extent of Meagan and Robert's injuries was presented at the hearing. Additionally, no further medical testimony or hospital records concerning the injuries were presented. Meagan and Robert each read to the court their victim impact statement. The defendant gave a statement in allocution.

¶ 26    At the conclusion of the sentencing hearing, the trial court made the following findings:

"THE COURT: Now regarding the great bodily harm question from the home invasion count, the Court saw the evidence admitted into evidence, the extent of the injury, which you can visually see. The Court read the stipulations. The Court heard the testimony of the witnesses. And I think there is substantial evidence that the conduct of Defendant leading to the conviction of the home invasion offense did cause great bodily harm to

10

Meagan Poole and Robert Poole. And I further find that that same conduct caused severe bodily injury to those two injuries, serious bodily injury.

* * *

THE COURT: *** Having considered the factual basis of the case, the presentence investigation report, the history, character and attitude of the Defendant, and the evidence presented this morning and the arguments of both counsel, the statutory matters in mitigation and aggravation, and the Defendant's statement in allocution, and having due regard for all the circumstances of the offense, I would impose the following sentence. On the home invasion, which is case 20 CF 110, I would sentence him to 20 years in the Illinois DOC. On the batteries, which are in 20 CF 99, Counts 1 and 3, two different batteries, two different victims, I'm going to sentence him to five years on each. I also find that these sentences should be consecutive. Now that will be followed with 18 months of court supervision, which will be the required amount."

¶ 27 The trial court did not make a finding of great bodily harm or severe bodily injury regarding Keenan. The defendant's motion to reconsider the sentences was denied, after which the defendant filed the instant appeal.

¶ 28                                    II. Analysis

¶ 29                          A. Sufficiency of The Evidence

¶ 30 The defendant initially contends that the State failed to prove him guilty of home invasion beyond a reasonable doubt, where the State's evidence supporting an essential element of home invasion, *i.e.*, that he did not have authority to enter the house, was severely impeached. Specifically, the defendant maintains that the testimony of each of the State's witnesses was

11

impeached where Investigator Cade's report did not reflect that they told him the defendant did not have the authority to enter the house.

¶ 31     At the outset, we reject the claim that the State's witnesses were impeached. This claim has no merit because a police report can only be used to impeach the officer who actually wrote the report. *People v. Gagliani*, 210 Ill. App. 3d 617, 629 (1991). In *Gagliani*, the defendant attempted to impeach a witness's testimony based on the omission of a statement in the police report. *Id.* The *Gagliani* court concluded that simply because the detective failed to mention the witness's statement in his police report in no way called into question the witness's trial testimony. *Id.* Rather, the court determined that the omission could be used only in an attempt to impeach the detective. *Id.* We reach the same conclusion here.

¶ 32     We turn now to the defendant's contention that the State failed to prove him guilty of home invasion beyond a reasonable doubt. Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend. XIV; Ill. Const. 1970 art. I, § 2. In determining whether there is sufficient evidence to convict, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004).

¶ 33     It is not the function of a reviewing court to retry the defendant or substitute its judgment for that of the finder of fact. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26. A reviewing court gives the State the benefit of all reasonable inferences. *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007). A defendant's conviction will be reversed only where the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *Id.* at 115.

12

It is the duty of the trier of fact to assess the credibility of the witnesses, assign the appropriate weight to testimony, and resolve discrepancies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004).

¶ 34 The home invasion statute is intended " 'to protect the safety of persons in their homes.' " *People v. Witherspoon*, 2019 IL 123092, ¶ 25 (quoting *People v. Hicks*, 181 Ill. 2d 541, 549 (1998)). A person commits home invasion when, without authority, he knowingly enters the occupied dwelling place of another and uses or threatens force while armed with a weapon or intentionally causes injury. 720 ILCS 5/19-6 (West 2022). Although the phrase "without authority" is not defined in the statute, our supreme court has held that "a defendant enters the dwelling place of another 'without authority' when either the occupant has not granted consent to enter or a court order has prohibited entry." *Witherspoon*, 2019 IL 123092, ¶ 25.

¶ 35 At trial, the defendant admitted he entered the home and swung the baseball bat at Meagan, Robert, and Keenan, resulting in their injuries. He denies, however, that he was not authorized to enter the home based on the many years he had been married to Meagan and his relationship with her parents. He maintains that, prior to February 7, 2020, no one ever told him that he was no longer allowed to be in the house. Contrary to the defendant's claims, the jury heard Meagan testify that around New Year's Eve, she had made it clear to the defendant that he was no longer welcome at the home. Additionally, Meagan's mother and son, Keenan, testified that the defendant was not supposed to be in the home. Here, in the face of conflicting testimony, the jury determined that Meagan's testimony that around New Year's Eve she had revoked the defendant's previous authority to enter the home was more credible. The jury, as finder of fact, was in a superior position to judge the credibility of the witnesses and resolve conflicts in their testimony, and we will not substitute our judgment on such matters. *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 95. Hence,

13

we find there was sufficient evidence to support the jury's determination that the State met its burden to prove that the defendant entered the home without authority. Furthermore, because we do not find that the defendant had authority to enter the home, we need not consider his argument regarding the limited authority doctrine.

¶ 36                           B. Consecutive Sentences

¶ 37    The defendant next argues that the trial court erred in imposing mandatory consecutive sentences where the record failed to support a finding of severe bodily injury. Where a defendant has been convicted of a Class X felony and has been found to have inflicted "severe bodily injury" during the commission of that felony, consecutive sentencing is mandatory. 730 ILCS 5/5-8-4(d)(1) (West 2022). The statute does not define what constitutes "severe bodily injury," and Illinois appellate courts have interpreted the phrase in different ways. The Fourth District has held that the difference between "great bodily harm" and "severe bodily injury" is merely semantic. *People v. Witherspoon*, 379 Ill. App. 3d 298, 308 (2008). However, the First and Second Districts have held that "severe bodily injury" requires something more than "great bodily harm" *People v. Alvarez*, 2016 IL App (2d) 140364, ¶¶ 23-24; *People v. Williams*, 335 Ill. App. 3d 596, 599-600 (2002). The *Alvarez* court noted that "whether a defendant inflicted 'great bodily harm' determines whether a sentencing enhancement applies (see 720 ILCS 5/8-4(c)(1)(D) (West 2008)), whereas whether a qualifying offense resulted in 'severe bodily injury' determines whether sentences must be consecutive (see 730 ILCS 5/5-8-4(d)(1) (West 2008))." *Alvarez*, 2016 IL App (2d) 140364, ¶ 24. In rejecting *Witherspoon*'s suggestion that the difference in the terms was merely semantic, the *Alvarez* court recognized that a finding of "great bodily harm" does not necessarily result in a finding of "severe bodily injury" for purposes of consecutive sentences and concluded that had the

14

legislature intended the terms to mean the same thing, it could have provided for it. *Id.* We believe the *Alvarez* decision was well reasoned and, thus, adopt this approach.

¶ 38    The determination by a trial court that a particular injury is "severe" for purposes of consecutive sentencing is a question of fact and may be reversed only if it is against the manifest weight of the evidence. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). Under the manifest weight standard, deference is given to the trial court as the finder of fact because the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 39    The defendant argues that although the State adduced witness testimony and introduced photos of the injuries sustained by Meagan and Robert, the evidence did not establish severe bodily injury and asserts that the record is "sparse" regarding the extent of their injuries. Although the victims testified that they went to the hospital for their injuries, they failed to disclose what treatment they received or how long they remained in the hospital. Moreover, other than their initial pain, Meagan and Robert did not indicate that they suffered any short-term or long-term pain. Nor did the State present any evidence of permanent disfigurement such as surgical marks or scarring. In support of his argument, the defendant relies on three cases: *People v. Murray*, 312 Ill. App. 3d 685, 694 (2000) (victim of an attempted murder did not suffer "severe" bodily injury; although gunshot "fractured" his big toe, he was able to run from the scene and was released from the hospital after 2½ hours of treatment); *People v. Ruiz*, 312 Ill. App. 3d 49, 63 (2000) (victim of attempt murder did not suffer "severe" bodily injury; although he was shot in the knee, the wound was barely visible in a photograph taken on the day of the offense and victim did not realize he had been shot, did not immediately seek medical treatment, and testified only that at one point he

15

felt a sharp pain in his knee); and *People v. Jones*, 323 Ill. App. 3d 451, 461 (2001) (defendant did not inflict "severe bodily injury" where a bullet merely "grazed" the complainant's cheek, requiring only a band-aid as medical treatment). We note that the cases cited by the defendant are readily distinguishable in that they all involved injuries requiring minimal medical treatment, if any. We also note that in determining the existence of severe bodily injury, "the length of one's hospital stay is not determinative; rather, it is but one factor to consider." *People v. Gonzalez*, 351 Ill. App. 3d 192, 208 (2004). Furthermore, the defendant fails to cite any authority to support the proposition that evidence of long-term pain or permanent disfigurement is required before a trial court can make a finding of "severe bodily injury." Even so, there was evidence that, at the time of trial, Robert had a scar on his forehead as the result of being struck by the defendant with the aluminum baseball bat.

¶ 40     In determining whether there was sufficient evidence to support the trial court's finding of "severe bodily injury," we are not left with a cold record. Rather, a picture is truly worth a thousand words. Photographic evidence graphically displayed a large, deep gash on Robert's forehead, which was obviously more "serious" than a fractured toe, a barely visible wound to the knee, or a grazed cheek discussed in the cases cited by the defendant. Additionally, photographic evidence displayed the top of Meagan's head, face, neck, and chest covered in blood from the wounds inflicted by the defendant. Based on our review of the record, the trial court's finding of severe bodily injury to Meagan and Robert does not strike us as unreasonable or arbitrary, and we do not find the opposite conclusion to be clearly evident. Accordingly, the trial court's finding of severe bodily injury is not against the manifest weight of the evidence.

¶ 41                           C. Defendant's Aggregate Prison Sentence

¶ 42    Finally, the defendant argues that the imposition of an aggregate 25-year sentence was improper where it amounted to a *de facto* life sentence, as he was 65 years old at the time of sentencing. By imposing such a lengthy sentence, the defendant argues, the trial court failed to properly balance the aggravating and mitigating factors and failed to impose a sentence that would serve to restore him to useful citizenship.

¶ 43    Home invasion causing injury is a Class X felony, punishable by a prison term of not less than 6 years and not more than 30 years. 730 ILCS 5/5-4.5-25 (West 2022). Here, the defendant's sentence on the conviction of home invasion was 20 years, within the sentencing range. Aggravated battery is a Class 3 felony, punishable by a prison term of not less than two years and not more than five years. *Id.* § 5-4.5-40. The defendant was given two concurrent five-year sentences on the aggravated battery convictions, also within the sentencing range. We note that the defendant's aggregate sentence of 25 years is less than the maximum sentence for the Class X felony.

¶ 44    "If a sentence falls within the statutory limits, it will not be overturned on appeal absent an abuse of discretion." *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16. "An abuse of discretion occurs only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense." *Id.* When determining an appropriate sentence, the trial court must consider the defendant's "credibility, demeanor, general moral character, mentality, social environment, habits, and age" and impose a sentence based on the circumstances of each case. (Internal quotation marks omitted.) *People v. Pina*, 2019 IL App (4th) 170614, ¶ 19. The trial court must also carefully consider the statutory factors in mitigation and aggravation. *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990). However, the trial court is not

17

required to recite and assign a value to each factor considered. *Pina*, 2019 IL App (4th) 170614, ¶ 19. There is a presumption that a trial court considers all mitigating evidence presented. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 33.

¶ 45 On appeal, the defendant highlights the numerous factors in mitigation present in his case, including that he had pursued an education, remained employed for years, and helped raise Meagan's six children. He also notes that he expressed remorse and apologized to the court and to the victims. However, the defendant fails to establish that the trial court did not properly balance the aggravating and mitigating factors where the trial court specifically found his education, employment, and assistance in raising Meagan's children to be mitigating factors. The trial court also found the defendant's statement of remorse and apology for his serious actions to be a factor in mitigation. The trial court then identified a number of aggravating factors, including, among others, the fact that there were three victims injured in this case and the defendant's prior adult criminal record. We find that the defendant has failed to overcome the presumption that the trial court considered all mitigating evidence presented. *Id.*

¶ 46 The defendant next asserts that the trial court failed to impose a sentence that would serve to restore him to useful citizenship. The Illinois Constitution requires courts to determine penalties " 'both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *People v. Bien*, 277 Ill. App. 3d 744, 755 (1996) (quoting Ill. Const. 1970, art. I, § 11). "Not *all* criminal defendants must be given an opportunity for rehabilitation or else life imprisonment would not be constitutionally permissible." (Emphasis in original.) *Id.* at 755-56. The trial court is vested with the responsibility for balancing between rendering justice and rehabilitating the defendant. *Id.* at 756. A defendant's rehabilitative potential is not entitled to greater weight by the trial court than the seriousness of the offense. *Id.* "The goal of rehabilitation

should not be elevated over the goal of justice." *Id.* There is no question that the defendant committed a serious offense when he entered the home without authority to do so and inflicted severe bodily injury on Meagan and Robert, in addition to injuring Keenan. Moreover, based on Palomo's testimony, the jury could reasonably have inferred that the defendant's attack on the victims while they were having dinner and relaxing in their home was premeditated. Under the facts presented, we do not find that the trial court was required to impose a sentence that would serve to restore the defendant to useful citizenship.

¶ 47    Finally, to the extent defendant argues on appeal that the trial court was required to make an express finding that he was "irredeemable" before ordering him to serve a *de facto* life sentence, we note that the defendant cites no authority supporting this argument. Accordingly, we find there is nothing in this record upon which to conclude that the trial court abused its discretion in fashioning the defendant's sentence.

¶ 48                                      III. Conclusion

¶ 49    For the foregoing reasons, we affirm the defendant's convictions and sentences.

¶ 50    Affirmed.

19

*People v. Langston*, 2024 IL App (5th) 220296

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Vermilion County, Nos. 20-CF-99, 20-CF-110; the Hon. Charles C. Hall, Judge, presiding. |
| **Attorneys for Appellant:** | DePaul University Legal Clinic, of Chicago (Maria A. Harrigan, of counsel, and Komal Tailor, law student), for appellant. |
| **Attorneys for Appellee:** | Jacqueline Lacy, State's Attorney, of Danville (Patrick Delfino, Patrick D. Daly, and Trent Marshall, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |